**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF NEW YORK**

MICHAEL A. MEDINA,

                          Plaintiff,

       -against-

DASH FILMS INC., DAMON DASH
PROMOTIONS LLC, DAMON DASH MUSIC
GROUP LLC, DAMON DASH ENTERPRISES I
LLC, DAMON DASH AND KANYE WEST,

                    Defendants.

Civil Action No.
1:15-cv-02551 (KBF)

**MEMORANDUM OF LAW IN SUPPORT OF DEFENDANT**
**KANYE WEST'S MOTION FOR JUDGMENT ON THE PLEADINGS**

Brad D. Rose
Tom J. Ferber
Dyan Finguerra-DuCharme
PRYOR CASHMAN LLP
7 Times Square
New York, New York 10036
Tel.: (212) 421-4100
Fax: (212) 798-6307

*Attorneys for Defendant Kanye West*

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ......................................................................................... ii

PRELIMINARY STATEMENT ................................................................................... 1

FACTS .......................................................................................................................... 1

    The History of "Loisaida" ........................................................................................ 1

    The *Loisaidas* Film ................................................................................................. 4

    Plaintiff's Allegations .............................................................................................. 5

ARGUMENT ................................................................................................................ 7

    I.    THE AMENDED COMPLAINT DOES
           NOT STATE A LEGALLY COGNIZABLE CLAIM ...................................... 7

    II.   THE FILM'S TITLE IS PROTECTED BY THE FIRST AMENDMENT,
          WHICH BARS PLAINTIFF'S LANHAM ACT CLAIMS AS A MATTER OF
          LAW .............................................................................................................. 8

          A.  Motion Pictures Are Protected Speech Under The First Amendment ...................... 9

          B.  The *Rogers* Test ................................................................................... 10

                1.  The Title "*Loisaidas*" Has Clear
                     Artistic Relevance To The Film's Story ........................................... 11

                2.  The Film's Title Is Not Explicitly Misleading .................................. 14

    III.  THE FILM'S USE OF "LOISAIDAS" IS A NONACTIONABLE FAIR USE ........... 17

    IV.  PLAINTIFF'S STATE LAW CLAIMS FAIL AS A MATTER OF LAW ................... 20

    V.   THE AMENDED COMPLAINT SHOULD
          BE DISPOSED OF ON THIS MOTION ................................................... 21

CONCLUSION ............................................................................................................ 22

## <u>TABLE OF AUTHORITIES</u>

<u>CASES</u>                                                                                     <u>PAGES(s)</u>

<u>American Med. & Life Ins. Co. v. CrossSummit Enters.</u>,
   27 Misc. 3d 1210(A), 2010 N.Y. Misc. LEXIS 760 (Sup. Ct. Apr. 1, 2010) ........................ 21

<u>Arrow Prods. v. Weinstein Co.</u>,
   44 F. Supp. 3d 359 (S.D.N.Y. 2014) .................................................................... 16

<u>Ashcroft v. Iqbal</u>,
   556 U.S. 662 (2009) ................................................................................... 7, 8

<u>BanxCorp v. Costco Wholesale Corp.</u>,
   723 F. Supp. 2d 596 (S.D.N.Y. 2010) .................................................................. 21

<u>Bell Atl. Corp. v. Twombly</u>,
   550 U.S. 544 (2007) ...................................................................................... 7

<u>Brown v. Electronic Arts, Inc.</u>,
   No. 2:09-cv-01598-FMC-RZx, 2009 U.S. Dist. LEXIS 131387
   (C.D. Cal. Sept. 23, 2009) ............................................................................. 13

<u>Charles Atlas, Ltd. v. DC Comics, Inc.</u>,
   112 F. Supp. 2d 330 (S.D.N.Y. 2000) .................................................................. 20

<u>In re Cooper</u>,
   254 F.2d 611 (C.C.P.A. 1958) ......................................................................... 15

<u>Cummings v. Soul Train Holdings LLC</u>,
   67 F. Supp. 3d 599 (S.D.N.Y. 2014) ................................................................. 8, 16

<u>DeClemente v. Columbia Pictures Indus.</u>,
   860 F. Supp. 30 (E.D.N.Y. 1994) ...................................................................... 15

<u>Dillinger, LLC v. Elec. Arts, Inc.</u>,
   No. 1:09-cv-1236-JMS-DKL, 2011 U.S. Dist. LEXIS 64006
   (S.D. Ind. June 16, 2011) ........................................................................... 13, 14

<u>Dombrowski v. Pfister</u>,
   380 U.S. 479 (1965) .................................................................................... 21

<u>E.S.S. Entm't 2000, Inc. v. Rock Star Videos, Inc.</u>,
   547 F.3d 1095 (9th Cir. 2008) ........................................................... 11, 12, 14, 16

<u>ETW Corp. v. Jireh Publ'g</u>,
   332 F.3d 915 (6th Cir. 2003) ........................................................................... 11

<u>Eastland Music Group, LLC v. Lionsgate Entm't, Inc.</u>,
   707 F.3d 869 (7th Cir. 2013), <u>cert. denied</u>, 134 S. Ct. 204 (U.S. 2013).................................. 22

ii

**<u>CASES</u>**                                                                          **<u>PAGES(s)</u>**

Farah v. Esquire Magazine,
    736 F.3d 528 (D.C. Cir. 2013) ................................................................. 21

Fortres Grand Corp. v. Warner Bros. Entm't, Inc.,
    947 F. Supp. 2d 922 (N.D. Ind. 2013), <u>aff'd</u>, 763 F.3d 696 (7th Cir. 2014) ......................... 15

Hensley Mfg. v. ProPride, Inc.,
    579 F.3d 603 (6th Cir. 2009) ................................................................. 18

Hicks v. Casablanca Records,
    464 F. Supp. 426 (S.D.N.Y. 1978) ............................................................. 9

Interactive Prods. Corp. v. A2Z Mobile Office Solutions, Inc.,
    326 F.3d 687 (6th Cir. 2003) ................................................................. 18

Joseph Burstyn, Inc. v. Wilson,
    343 U.S. 495 (1952) ........................................................................ 9

KP Permanent Make-Up, Inc. v. Lasting Impression I, Inc.,
    543 U.S. 111 (2004) ....................................................................... 18

L-7 Designs, Inc. v. Old Navy, LLC,
    647 F.3d 419 (2d Cir. 2011) ................................................................. 8

Lemme v. NBC,
    472 F. Supp. 2d 433 (E.D.N.Y. 2007) ........................................................ 17

Leopold v. Levin,
    45 Ill. 2d 434 (1970) ...................................................................... 10

Louis Vuitton Mallatier S.A. v. Warner Bros. Entm't Inc.,
    868 F. Supp. 2d 172 (S.D.N.Y. 2012) .............................................. *passim*

Louis Vuitton Malletier v. Dooney & Bourke, Inc.,
    561 F. Supp. 2d 368 (S.D.N.Y. 2008) ....................................................... 20

Madrigal Audio Labs. v. Cello, Ltd.,
    799 F.2d 814 (2d Cir. 1986) ................................................................. 18

Mattel, Inc. v. MCA Records,
    296 F.3d 894 (9th Cir. 2002) ........................................................ 11, 14, 15

Naked Cowboy v. CBS,
    844 F. Supp. 2d 510 (S.D.N.Y. 2012) ....................................................... 19

Rin Tin Tin, Inc. v. First Look Studios, Inc.,
    671 F. Supp. 2d 893 (S.D. Tex. 2009) ....................................................... 15

**CASES**                                                                                    **PAGES(s)**

Rogers v. Grimaldi,
   695 F. Supp. 112 (S.D.N.Y. 1988), aff'd, 875 F.2d 994 (2d Cir. 1989) ............................... 10

Rogers v. Grimaldi,
   875 F.2d 994 (2d Cir. 1989) ................................................................... 11, 14, 15

Roxbury Entm't v. Penthouse Media Group, Inc.,
   669 F. Supp. 2d 1170 (C.D. Cal. 2009) .................................................... 12, 13, 15

Schad v. Mount Ephraim,
   452 U.S. 61 (1981) .............................................................................................. 9

Stewart Surfboards, Inc. v. Disney Book Group, LLC,
   No. CV 10-2982 GAF (SSx), 2011 U.S. Dist. LEXIS 155444
   (C.D. Cal. May 11, 2011) ......................................................................... 16, 17, 21

Sugar Busters LLC v. Brennan,
   177 F.3d 258 (5th Cir. 1999) ............................................................................. 11

Syler v. Woodruff,
   610 F. Supp. 2d 256 (S.D.N.Y. 2009) ................................................................ 17

Technomarine SA v. Jacob Time, Inc.,
   905 F. Supp. 2d 482 (S.D.N.Y. 2012) ...............................................................7, 8

Technomarine SA v. Jacob Time, Inc.,
   No. 12 civ. 0790 (KEF), 2012 U.S. Dist. LEXIS 90261 (S.D.N.Y. June 22, 2012) ............... 8

Tri-Star Pictures, Inc. v. Unger,
   14 F. Supp. 2d 339 (S.D.N.Y. 1998) .................................................................. 20

Twin Peaks Prods. v. Publ'ns Int'l,
   996 F.2d 1366 (2d Cir. 1993) ........................................................................... 17

Valencia v. Universal City Studios LLC,
   Civil Action No. 1:14-CV-00528-RWS, 2014 U.S. Dist. LEXIS 174644
   (N.D. Ga. Dec. 18, 2014) ............................................................................. 12, 14

Washington Post Co. v. Keogh,
   365 F.2d 965 (D.C. Cir. 1966) .......................................................................... 21

Woodard v. Jackson,
   No. 1:03-cv-0844-DFH, 2004 U.S. Dist. LEXIS 6292 (S.D. Ind. Mar. 25, 2004) .......... 13, 14

Yankee Publ'g v. News Am. Publ'g,
   809 F. Supp. 267 (S.D.N.Y. 1992) .................................................................... 20

**<u>STATUTES</u>**

Fed. R. Civ. P. 12(b)(6) ...................................................................................................7, 13, 18

Fed. R. Civ. P. 12(c) ..................................................................................................... 1, 7, 16, 24

15 U.S.C. § 1125(a) ................................................................................................................. 6

17 U.S.C. § 1115(b)(4) ............................................................................................................ 17

Defendant Kanye West ("West") respectfully submits this memorandum of law in support of his motion for judgment on the pleadings, pursuant to Federal Rule of Civil Procedure 12(c), and for dismissal of the Amended Complaint of plaintiff Michael Medina ("Medina" or "Plaintiff").

## PRELIMINARY STATEMENT

This action concerns a film entitled "Loisaidas" (the "Film").  The Film depicts confrontations between uptown and downtown Manhattan gangs in the Latino Lower East Side, which has long been called "Loisaida" (pronounced "low-ee-SIDE-uh), a description which is 40 years old, has been officially recognized by New York City, and is abundant in popular culture. Despite the widespread use of this term since the 1970s, Medina claims to own a monopoly on it because of his 2012 trademark registration for "Loisaidas" based on a musical group of that name.

The Amended Complaint palpably fails to offer plausible factual allegations, as is required to state a legally sufficient claim, but Plaintiff's claims of infringement under the Lanham Act and New York common law would still fail as a matter of law even if Plaintiff had offered more than a rote recitation of elements.  As is set forth below, Plaintiff's claims are precluded by the First Amendment and the fair use doctrine, so that the Amended Complaint is incurable.

## FACTS

### The History of "Loisaida"

On September 2, 2012,  *The New York Times* published an article entitled "A Cultural History of New York in 50 Objects."  (See Ex. 5 to West Amended Answer;

http://www.nytimes.com/interactive/2012/09/02/nyregion/a-history-of-new-york-in-50-objects.html.)  Object Number 44 in that history was accompanied by the following photograph



and a caption that stated "It was called the Lower East Side, the East Village, Alphabet City. But in Nuyorican, the local Latino vernacular, it is Loisaida. Popularized by the poet Bittman Rivas in 1974, the name became official when the city sanctioned Loisaida Avenue as another name for Avenue C in 1987."[1]

As the article explained, designating the thoroughfare "Loisaida Avenue" merely made "official" a term which had been in use since the 1970s, when Rivas wrote his poem entitled "Loisaida."[2]  Other articles and writings have referred to "Loisaida" for decades.  The author of a 1981 *New York Times* article entitled *The Real Loisaida* (included in Ex. 3 to West Amended Answer) wrote:

> Loisaida, actually, is the area between 14th and Houston Streets, from Avenue A east. This sunny, flowery, Spanish-flavored name for the Lower East Side was

---

[1] Plaintiff's Original Complaint included another photograph of the "LOISAIDA AV" street sign, at page 5 of Ex. B thereto.  (The entirety of Plaintiff's Original Complaint is Ex. 1 to the West Amended Answer.)

[2] Exhibit A to Plaintiff's Original Complaint (which is Ex.1 to West Amended Answer) states Rivas wrote the poem in 1974.  (See copy of the Rivas poem, as published in an anthology entitled "Aloud: Voices from the Nuyorican Poets Café," Ex. 2 to West Amended Answer.)

conferred on an unpromising piece of real estate by our Puerto Rican fellow residents to cheer things up a bit. The title, pronounced low-ee-SIDE-ah, was in use before 1977, when I moved here to start the magazine The Quality of Life in Loisaida. Bimbo Rivas, poet and playwright, is credited with first applying the name and using it in a poem. A documentary film on Loisaida, by Tylis, a local group, has been shown on West German television. There is a Loisaida Craft Co-op and there have been Loisaida Town Meetings and Loisaida Fairs. These are only some examples of the use of the name, which is known to city offices concerned with housing.

(See also "Lower East Side: cultural stew in N.Y. melting pot," *The Christian Science Monitor*, September 20, 1984 (also included in Ex. 3.))

Since the term "Loisaida" was coined over 40 years ago, references to it in popular culture have been abundant.  There has been a musical group "A Band Called Loisaida" (a/k/a "ABC Loisaida" and just "Loisaida").[3]  There have been several sound recordings including: a 1982 music anthology album entitled *Peripheral Vision – Bands of Loisaida, New York City*[4]; the Loisaida Sisters' *Home Cooking*, in 1997[5]; *Life in Loisaida* by Chaser, in 1998[6]; and *Dimitri from Loisaida*, in 2014.[7]  And "Loisaida" has been used in the titles of several books, including: *Homesteading in New York City:, 1978 – 1993: The Divided Heart of Loisaida* (1999)[8]; the 2006 novel *The Lamentable Journey of Omaha Bigelow into the Impenetrable Loisaida Jungle*[9]; *Loisaida: NYC Community Gardens* (2006)[10]; the simply named 2011 novel *Loisaida*[11]; and the novel *Loisaida: A New York Story*, published this past April.[12]

---

[3] See, e.g., Ex. 4 (explaining the beginning of the group) and Ex. 12 (2001 album entitled "Priority Seating" by Loisaida) to West Amended Answer.
[4] See Ex. 8 to West Amended Answer and *New York Times* article dated September 8, 2982 entitled *The Pop Life*, included in Ex. 3.
[5] See Ex. 9 to West Amended Answer.
[6] See Ex. 10 to West Amended Answer.
[7] See Ex. 16 to West Amended Answer.
[8] See Ex. 11 to West Amended Answer.
[9] See Ex. 13 to West Amended Answer.
[10] See Ex. 14 to West Amended Answer.
[11] See Ex. 15 to West Amended Answer.
[12] See Ex. 17 to West Amended Answer.

There is also Loisaida, Inc., a local development corporation dating back to the 1970s, which started as a grassroots movement to combat violence, drugs, gangs and poverty in "Loisaida" and continues to serve the community in various ways.[13]  And since 1987, there has been the annual Loisaida Festival. (Id.)

The *Loisaidas* Film

The Film, its promotional posters and its trailer clearly state that it is presented by "Damon Dash Studios," and a stylized logo of its title on top of a handgun appears on its posters and elsewhere.[14]  The synopsis of *Loisaidas*[15] reads as follows:

> Rugby and Mel talk in the LES about what brought the former downtown from his native Harlem. Rugby tells a story about himself and Remy, both respected hustlers in Harlem.
>
> Mel is a young and ambitious street kid and amateur BMX street rider in the Lower East Side of Manhattan. He rides his bike through the streets until he arrives at the penthouse apartment of his older friend and mentor, Rugby. The two speak and Rugby tells Mel about what first brought him down to Loisaida. After Rugby and his partner, Remy, are forced to leave their native Harlem in the wake of a brutal triple-homicide, they find themselves in the predominantly Spanish section of the Lower East Side. Once there they run into characters from all walks of downtown life: The crooked cop, Lobo, a local girl named Yolanda, and a notorious hit squad known as The Warlocks. Uptown and Downtown collide to create a new breed of hustlers, The Loisaidas.

(See Ex. 18 to West Amended Answer.)

The Film largely takes place in the Latino section of the Lower East Side.  The opening of the Film prominently displays the following text:

**There is a place**

**Where there are no rules**

---

[13] See Ex. 6 to West Amended Answer.
[14] For the Court's convenience, screen shots from the beginning of the Film's chapters are set forth at Ex. 20 to the West Amended Answer.  Copies of posters, promotional materials, and screen shots from its trailers are included at Ex. 21.
[15] A copy of the Film is Ex. 7 to West Amended Answer.

**Where the wrong move can cost a life**

**A place to get money**

**And risk dying for it everyday.**

**LOISAIDAS**

The film has eight chapters, each of which states "Damon Dash Studios Presents"[16] at the beginning.  (See Ex. 20 to West Amended Answer.)  The first chapter is titled "Welcome to Loisaidas."  The story tracks several characters from different walks of life trying to make a living on the streets of the Lower East Side.  Many of the characters discuss growing up in Harlem, and why they ultimately moved to what they regularly refer to as "Loisaidas."  For instance, in the third chapter, one of the characters discusses reaching out to his friend in "Loisaidas": "We hit up our homie "Blackface" downtown in Loisaidas."  Elsewhere, the characters discuss the benefits of moving from uptown in Harlem to "Loisaidas": "Loisaidas has everything kind of thing [sic] you could think of. . . Turns out, Loisaidas was the place to be." And in Chapter VII,  the narrator of the film states: "There were seven other cats from Loisaidas who was mad enough to bleach the police."  In that same chapter, one of the characters proudly exclaims twice, "I'm from Loisaidas."  The film reflects the struggle of working on the streets of the Lower East Side, and what it takes for some young males to be accepted by its denizens, the Loisaidas.  In the final chapter, one of the Loisaidas tells another: "If you wanna get in the Loisaidas, here's your chance," which leads to the second man shooting another in a barber shop in order to become accepted as one of the "Loisaidas."

Plaintiff's Allegations

Plaintiff Medina claims that he "started a Latin band" for which he allegedly "coined the name Loisaidas."  (See Am. Complt. at p.1.)  Medina is not a member of Loisaidas, which

---

[16] It sometimes says "Dame Dash Studios Presents."

consists of Aquiles Nuñez and Isaiah Parker.  As the exhibits to the Amended Complaint explain, this "Urban Bachata duo hail[s] from (NYC) Manhattan's Lower East Side, hence the name Loisaidas – which is the Spanish slang term for 'lower east siders.'"[17]  (Ex. B to Amended Complaint; emphasis supplied)

While it offers no specific facts, the Amended Complaint alleges that there has been and will be  "actual confusion" between the Film, which it describes as "graphically depict[ing] murder, violence and drug sales," and the musical duo, which performs "Urban Bachata"[18] music. (Am. Complt. at ¶¶ 33, 42.)  Plaintiff alleges that there has been and will be a mistaken belief among the public that "Loisaidas" originated with the Film, and that "relevant consumers are likely to confuse Defendants' LOISAIDAS film with Plaintiff's LOISAIDAS marks."  (Id. at ¶¶ 43, 45.)

Plaintiff alleges that he registered "Loisaidas" as a trademark for the Latino musical duo on January 17, 2012, based on a first use in commerce of November 2008.  (See Am. Complt. at ¶ 49 and Ex. A thereto.)  Claiming that defendants "have taken advantage of the creative skill of Plaintiff" and that they "injected their products into commerce with the express intent of profiting from Plaintiff's valuable registered trademark," Plaintiff alleges that defendants have infringed his registered trademark "in violation of Section 35 [sic] of the Lanham Act, 15 U.S.C. Section 1114(1)."  (Am. Complt. at ¶¶ 52, 54, 60.)  Plaintiff also conclusorily alleges that "Defendants' use of Plaintiff's word mark results in confusion as to sponsorship, association, source and origin of the Plaintiff's and Defendants' products," in violation of Section 43(a) of the Lanham Act (15 U.S.C. §1125 (a)), although he offers no supporting factual allegations.

---

[17] Medina's Original Complaint (Ex. 1 to West Amended Answer) also acknowledged that "'Loisaida' is a term derived from the Spanish pronunciation of 'Lower East Side,'" and incorporated a Wikipedia article discussing the origins of the term, as set forth above.  (Id. at ¶ 11 and Ex. A.)
[18] Bachata is a Latino genre of music (and dance) that originated in the Dominican Republic.

(Am. Complt. at ¶¶ 62-76.)  Finally, in his third purported "count," Plaintiff alleges various violations of New York State common law.  (Am. Complt. at ¶¶88-96.)

<u>**ARGUMENT**</u>

## I.   THE AMENDED COMPLAINT DOES <u>NOT STATE A LEGALLY COGNIZABLE CLAIM</u>

In order to survive a motion to dismiss, whether under Rule 12(b)(6) or, as here, Rule 12(c), a complaint must articulate sufficient plausible factual allegations to raise a right to relief beyond a speculative level.  <u>Bell Atl. Corp. v. Twombly</u>, 550 U.S. 544, 555 (2007).  The Supreme Court clarified this standard in <u>Ashcroft v. Iqbal</u>, 556 U.S. 662 (2009) ("<u>Iqbal</u>"):

> As the Court held in Twombly, … <u>the pleading standard</u> Rule 8 announces does not require "detailed factual allegations," but it <u>demands more than an unadorned, the-defendant-unlawfully-harmed-me accusation.</u> .. <u>A pleading that offers "labels and conclusions" or "a formulaic recitation of the elements of a cause of action will not do.</u>" … Nor does a complaint suffice if it tenders "naked assertion[s]" devoid of "further factual enhancement." <u>Id.</u>, at 557…. To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to "state a claim to relief that is plausible on its face." …. A claim has <u>facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable</u> for the misconduct alleged…. <u>The plausibility standard</u> is not akin to a "probability requirement," but it <u>asks for more than a sheer possibility that a defendant has acted unlawfully</u>…. <u>Where a complaint pleads facts that are "merely consistent with" a defendant's liability, it "stops short of the line between *possibility* and *plausibility* of 'entitlement to relief.'"</u>

556 U.S. at 678 (internal citations omitted; emphasis supplied)

Plaintiff's Amended Complaint fails to meet this standard, as it is replete with precisely the type of "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements" which this Court has held "do not suffice."  <u>Technomarine, SA v. Jacob</u>

Time, Inc., 905 F. Supp. 2d 482, 487 (S.D.N.Y. 2012) (Forrest, J.), quoting Iqbal, 556 U.S. at 678.[19]

The Amended Complaint not only fails the applicable pleading standard, but Plaintiff's purported trademark and unfair competition claims – all of which are based on the Film's title – are precluded as a matter of law.  As is explained below, both the First Amendment and the fair use exception to trademark infringement bar Plaintiff's claims. "Loisaidas" is, as Plaintiff himself acknowledged to the U.S. Patent and Trademark Office ("USPTO"), taken "from the Latino pronunciation of Lower East Side."[20]  It is a well-known, widely used term[21] which the law will not allow Plaintiff to appropriate and monopolize, as he seeks to do in this action.  Moreover, the title of the Film is not, and could not plausibly be claimed to be, its source-denoter.

## II.   THE FILM'S TITLE IS PROTECTED BY THE FIRST AMENDMENT, WHICH BARS PLAINTIFF'S LANHAM ACT CLAIMS AS A MATTER OF LAW

Medina alleges various violations of the Lanham Act, claiming that Defendants' use of the term "Loisaidas" as the title of the Film violates his purported trademark rights in that term. However, these claims are all precluded as a matter of law, because the use of the term "Loisaidas" as the title of the Film is protected by the First Amendment.

---

[19] With respect to Plaintiff's expressed desire to pursue discovery based on the conclusory allegations of the Amended Complaint, this Court has also held that such pleadings "do[] not unlock the doors of discovery for a plaintiff armed with nothing more than conclusions." Id., quoting Iqbal, 556 U.S. at 678-79.

[20] See Plaintiff's "Response to Office Action" in the USPTO (Ex. 19 to West Amended Answer), which is a publicly available government record.

[21] The widespread nature of its use is reflected in many of the exhibits to the West Amended Answer (e.g., newspaper articles, books, and sound recordings), of which the Court may take judicial notice.  See, e.g., L-7 Designs, Inc. v. Old Navy, LLC, 647 F. 3d 419, 422 (2d Cir. 2011) ("On a 12(c) motion, the court considers the complaint, the answer, any written documents attached to them, and any matter of which the court can take judicial notice for the factual background of the case") (citations & quotations omitted); Technomarine SA v. Jacob Time, Inc., No. 12 Civ. 0790 (KEF), 2012 U.S. Dist. LEXIS 90261, at *4 n.1 (S.D.N.Y. June 22, 2012) (Forrest, J.) (court may consider matters of which judicial notice may be taken, including "the fact that a publicly accessible website contains certain information" and of the "fact of its publication" of certain materials); Cummings v. Soul Train Holdings LLC, 67 F. Supp. 3d 599, 602 (S.D.N.Y. 2014).

A.        **Motion Pictures Are Protected Speech Under The First Amendment**

Artistic expression, such as the Film, is constitutionally protected speech.  The

application of the First Amendment's protections to motion pictures and other works of

entertainment has been established since the Supreme Court's decision in <u>Joseph Burstyn, Inc. v.</u>

<u>Wilson</u>, 343 U.S. 495 (1952), in which the Court stated:

> It cannot be doubted that motion pictures are a significant medium for the
> communication of ideas. They may affect public attitudes and behavior in a
> variety of ways, ranging from direct espousal of a political or social doctrine to
> the subtle shaping of thought which characterizes all artistic expression. The
> importance of motion pictures as an organ of public opinion is not lessened by the
> fact that they are designed to entertain as well as to inform. As was said in
> *Winters* v. *New York,* 333 U. S. 507, 510 (1948):
>
>> "The line between the informing and the entertaining is too elusive for the
>> protection of that basic right [a free press]. Everyone is familiar with
>> instances of propaganda through fiction. What is one man's amusement,
>> teaches another's doctrine."
>
> It is urged that motion pictures do not fall within the First Amendment's aegis
> because their production, distribution, and exhibition is a large-scale business
> conducted for private profit. We cannot agree. That books, newspapers, and
> magazines are published and sold for profit does not prevent them from being a
> form of expression whose liberty is safeguarded by the First Amendment.  We fail
> to see why operation for profit should have any different effect in the case of
> motion pictures.

<u>Id.</u> at 501-02.  <u>See also</u> <u>Schad v. Borough of Mt. Ephraim</u>, 452 U.S. 61, 65 (1981).

("Entertainment, as well as political and ideological speech, is protected; motion pictures,

programs broadcast by radio and television, and live entertainment, such as musical and dramatic

works, fall within the First Amendment guarantee") (citations omitted).

Courts across the nation have adhered to this principle when addressing claims brought

against motion pictures under every theory from Lanham Act violations to right of publicity

claims.  <u>See, e.g.</u>,  <u>Hicks v. Casablanca Records</u>, 464 F. Supp. 426 (S.D.N.Y. 1978) (granting

motion to dismiss and denying preliminary injunction on claims against fictional film and book

about Agatha Christie entitled "Agatha");  Leopold v. Levin, 45 Ill. 2d 434, 441-42 (1970)

(affirming summary judgment dismissing plaintiff's privacy claim against motion picture and its

advertising).

**B.      The *Rogers* Test**

The conflict between Lanham Act claims and the First Amendment jurisprudence

regarding artistic expression was addressed in the seminal case of Rogers v. Grimaldi, 695 F.

Supp. 112 (S.D.N.Y. 1988), aff'd, 875 F.2d 994 (2d Cir. 1989), which concerned director

Federico Fellini's film *Ginger and Fred*.  The film was not about the iconic American film stars

Ginger Rogers and Fred Astaire, but about two fictional Italian cabaret performers who had

earned their livings by imitating Rogers and Astaire.  Id. at 996-97.  Rogers alleged that the use

of her name in the film's title violated the Lanham Act.  The Court noted:

> Many titles, however, include a well-known name without any overt indication of
> authorship or endorsement — for example, the hit song "Bette Davis Eyes," and
> the recent film "Come Back to the Five and Dime, Jimmy Dean, Jimmy Dean."
> To some people, these titles might implicitly suggest that the named celebrity had
> endorsed the work or had a role in producing it. Even if that suggestion is false,
> the title is artistically relevant to the work. In these circumstances, the slight risk
> that such use of a celebrity's name might implicitly suggest endorsement or
> sponsorship to some people is outweighed by the danger of restricting artistic
> expression, and the Lanham Act is not applicable. *Cf.* Estate of Hemingway v.
> Random House, Inc., 23 N.Y.2d 341, 350, 296 N.Y.S.2d 771, 780, 244 N.E.2d
> 250, 260 (1968) (holding that estate of Ernest Hemingway had no cause of action
> for "palming off" or "unfair competition" against author of biographical memoir
> entitled "Papa Hemingway.").
>
> Similarly, titles with at least minimal artistic relevance to the work may include
> explicit statements about the *content* of the work that are seriously misleading.
> For example, if the characters in the film in this case had published their memoirs
> under the title "The True Life Story of Ginger and Fred," and if the film-maker
> had then used that fictitious book title as the title of the film, the Lanham Act
> could be applicable to such an explicitly misleading description of content. But
> many titles with a celebrity's name make no explicit statement that the work is
> about that person in any direct sense; the relevance of the title may be oblique and
> may become clear only after viewing or reading the work.  As to such titles, the
> consumer interest in avoiding deception is too slight to warrant application of the
> Lanham Act.

Id. at 999-1000 (emphasis supplied).

The Second Circuit held that the First Amendment precludes Lanham Act claims premised upon the title of an expressive work unless the title "has *no* artistic relevance to the underlying work whatsoever, or, if it has some artistic relevance, unless [it] *explicitly* misleads as to the source or the content of the work." Id. at 999 (emphasis added). Finding *Ginger and Fred's* title artistically relevant to the film's fictional content and not explicitly misleading as to its source, the Court affirmed the dismissal of Rogers's Lanham Act claim as a matter of law. Id. at 1000-1005. The two-prong Rogers test – *i.e.,* (i) whether a work's title has some artistic relevance to its content and (ii) whether it *explicitly* misleads – has been widely adopted and has been extended to the use of both names and trademarks in the *content* of expressive works, as well as in their *titles*, leading to such claims regularly being dismissed as a matter of law. See, e.g., Louis Vuitton Mallatie S.A. v. Warner Bros. Entm't Inc., 868 F. Supp. 2d 172, 177 n.9 (S.D.N.Y. 2012) ("Louis Vuitton") (use of trademark in content of film); Mattel, Inc. v. MCA Records, 296 F.3d 894, 902 (9th Cir. 2002) (use of trademark in title and content of song); ETW Corp. v. Jireh Publ'g, Inc., 332 F.3d 915, 928 (6th Cir. 2003) (use of name and trademark in marketing materials for prints of painting); Sugar Busters LLC v. Brennan, 177 F.3d 258, 269 n.7 (5th Cir. 1999) (use of trademark in title).

     1.     **The Title "*Loisaidas*" Has Clear**
             **Artistic Relevance To The Film's Story**

The Rogers court emphasized that the first element of this test reflects an "appropriately low threshold of minimal artistic relevance" in light of First Amendment considerations. 875 F.2d at 999. See Louis Vuitton, 868 F. Supp. 2d at 178; E.S.S. Entm't 2000, Inc. v. Rock Star Videos, Inc., 547 F.3d 1095, 1100 (9th Cir. 2008) ("only the use of a trademark with no artistic

relevance to the underlying work whatsoever does not merit First Amendment protection.  In other words, the level of relevance merely must be above zero") (internal citation and quotation marks omitted).

The title *Loisaidas* – for a motion picture that tells a story about the neighborhood that is officially recognized as "Loisaida" and its denizens – has more than merely "*some* artistic relevance" to the Film.  See, e.g, Valencia v. Universal City Studios LLC, Civ. A. No. 1:14-cv-00528-RWS, 2014 U.S. Dist. LEXIS 174644, at *21 (N.D. Ga. Dec. 18, 2014) (dismissing Lanham Act claims against film about hip hop dancer "Honey Rockwell," holding *Honey* was artistically relevant to protagonist's first name); E.S.S. Entm't 2000, 547 F.3d at 1100 ("only the use of a trademark with no artistic relevance to the underlying work whatsoever does not merit First Amendment protection.  In other words, the level of relevance merely must be above zero") (quotation marks omitted) (emphasis supplied).

In Roxbury Entm't v. Penthouse Media Group, Inc., 669 F. Supp. 2d 1170, 1173 (C.D. Cal. 2009), the plaintiff, who owned the trademark "Route 66," filed suit against the entities which had made a pornographic film with that same title.  The film's only relationship to the "Route 66" interstate was that "[t]he 'story' unfolds at a roadside motel, to which the couple pulls up in a red convertible in the opening scene of the movie.  Subsequent dialogue indicates that the couple is traveling and is 'on the run' from someone, who has sent someone to pursue them."  Id. at 1173.  The court found that even this minimal connection satisfied the first prong of the Rogers test and dismissed plaintiffs' claims as a matter of law.  Id. at 1176.  It follows *a fortiori* that in the present case, in which the title of the Film utilizes the officially recognized and widely used term for the neighborhood and inhabitants of the Lower East Side which are at the center of its story, the first prong of the test is met.

12

In <u>Woodard v. Jackson</u>, No. 1:03-cv-0844-DFH, 2004 U.S. Dist. LEXIS 6292, at *3 (S.D. Ind. Mar. 25, 2004), the plaintiffs, the "former members of a musical ensemble" known as "*Ripples and Waves*," asserted Lanham Act claims against Michael Jackson premised upon the title of his album "Ripples and Waves – An Introduction to Michael Jackson & the Jackson Five."  Applying <u>Rogers</u> to the album's title and finding the requisite degree of artistic relevance, the court dismissed the claims on a 12(b)(6) motion.  <u>Id.</u> at *24-25.  For the same reasons, Plaintiff Medina's claim, in which he asserts that the name of his "musical ensemble" is wrongly used as the title of the Film, should be dismissed as a matter of law since "Loisaidas" is a far more widespread and independently meaningful term than "Ripples and Waves."

Finally, the court in <u>Dillinger, LLC v. Electronic Arts, Inc.</u>, No. 1:09-cv-1236-JMS-DKL, 2011 U.S. Dist. LEXIS 64006 (S.D. Ind. June 16, 2011), found that the name "Dillinger" in reference to a Tommy Gun was artistically relevant to Defendants' *The Godfather* video game because "[t]he gentleman-bandit, commonly known for his public persona as a 'flashy gangster who dressed well, womanized, drove around in fast cars, and sprayed Tommy Guns,' has <u>above-zero</u> relevance to a game whose premise enables players to act like members of the mafia and spray Tommy Guns."  <u>Id.</u> at *14, citing <u>Roxbury</u>, 669 F. Supp. at 1176 (emphasis supplied).  <u>See also</u> <u>Brown v. Electronic Arts, Inc.</u>, No. 2:09-cv-01598-FMC-RZx, 2009 U.S. Dist. LEXIS 131387, at *12 (C.D. Cal. Sept. 23, 2009) (dismissing Lanham Act claims of former professional football player Jim Brown against maker of football video game, holding that use "was not completely irrelevant to the games' content").

Here, it is beyond dispute that the Film's title, which is a commonly used term,  has the requisite level of artistic relevance to its content.

## 2.    **The Film's Title Is Not Explicitly Misleading**

Like the "relevance" prong of the <u>Rogers</u> test, the "explicitly misleading" prong preserves First Amendment protections except in extraordinary cases.  <u>See, e.g.</u>, <u>E.S.S. Entm't 2000</u>, 547 F.3d at 1099-1101.  Under this prong of the test, a work's title is not "explicitly misleading" absent some affirmative claim by defendant that the work originated with the plaintiff.  <u>See</u> <u>Dillinger</u>, 2011 U.S. Dist. LEXIS 64006, at *22-23 ("Plaintiff points to no explicit misrepresentation—that fact alone is dispositive of this issue") (<u>citing</u> <u>Rogers</u>, 875 F.2d at 999 and <u>E.S.S. Entm't 2000</u>, 547 F.3d at 1100-1101) (emphasis added).  Medina does not and could not allege that the Film makes any explicit representation that it originates with or was endorsed by Medina.[22]  (Nor, of course, would it make any sense to do so, given that the Film has no connection with Plaintiff's Bachata music.)[23]  <u>See e.g.</u>, <u>Mattel</u>, 296 F.3d at 902 ("The *only* indication that Mattel might be associated with the song is the use of Barbie in the title; if this were enough to satisfy this prong of the *Rogers* test, it would render *Rogers* a nullity"; held that title "Barbie Girl" could not explicitly mislead consumers that pop song emanated from Barbie toy manufacturer Mattel); <u>Valencia</u>, 2014 U.S. Dist. LEXIS 174644, at *20-22.

A work's title can only "explicitly mislead" the public where it <u>affirmatively misrepresents</u> the work's origin or content.  <u>Rogers</u>, 875 F.2d at 999-1001  (explaining that an inclusion of subtitle "an authorized biography," if false, would constitute a misrepresentation sufficient to "explicitly mislead" consumers).  Otherwise, the mere "risk of misunderstanding,

---

[22] As with similar claims that have failed as a matter of law, the Amended Complaint offers only vague allegations of confusion, rather than any specific allegation that Defendants have made an explicitly misleading statement.  <u>See</u> <u>Louis Vuitton</u>, 868 F. Supp. 2d at 181.  For this reason alone, as in <u>Louis Vuitton</u>, Medina's allegations of confusion are not plausible and do not pass the requisite threshold.  <u>Id.</u> at 182.

[23] The <u>Woodard</u> court noted that it would be "absurd to suggest" that The Jackson Five and their record company would seek to gain some commercial advantage by confusing the public into believing that they might be buying sound recordings connected with plaintiffs' musical group.  2004 U.S. Dist. LEXIS 6292, at *30.  Similarly, here it would be "absurd to suggest" that Defendants would seek some commercial advantage by confusing the public into believing that the Film – which, as Plaintiff alleges, tells a story of a "violent, gangster-infused world [involving] drug dealing, mob wars, and murder" (Am. Complt. at p. 1) – is about or from Plaintiff's Bachata music duo.

not engendered by any overt claim in the title, is so outweighed by the interests in artistic expression as to preclude application of the Lanham Act."  Id. at 999-1001.  See Fortres Grand Corp. v. Warner Bros. Entm't, Inc., 947 F. Supp. 2d. 922, 932 (N.D. Ind. 2013), aff'd, 763 F.3d 696 (7th Cir. 2014) (citation omitted) (dismissing Lanham Act claim against film under Rogers, noting "[t]he fact that it has to be explicitly misleading makes this a high bar," which requires that "defendant's work must make some affirmative statement of the plaintiff's sponsorship or endorsement, beyond the mere use of plaintiff's name or other characteristic"); Roxbury Entm't, 669 F. Supp. 2d at 1176 ("Mere use, without more, is insufficient to make the use explicitly misleading") (citation omitted).

There is nothing in the Film's title from which one could plausibly draw the conclusion that Defendants are "explicitly misleading" consumers about the Film's origin.  As in Rogers, "[t]he title [of Defendants' film] contains no explicit indication that [Plaintiff] endorsed the [Defendants'] film or had a role in producing it."  Rogers, 875 F.2d at 1001.  As the Mattel court stated: "[c]onsumers expect a title to communicate a message about the book or movie, but they do not expect it to identify the publisher or producer."  296 F.3d at 902 (emphasis added) (citation omitted).  See also In re Cooper, 254 F.2d 611, 615-16 (C.C.P.A. 1958) (a "title… identifies a specific literary work… and is not associated in the public mind with the … manufacturer…") (internal quotation marks omitted).[24]

The source of the Film is regularly noted –the opening credits state "Damon Dash Studios Presents."  It is that prominent designation,  not "Loisaidas," which identifies the Film's origin. See, e.g., Rin Tin Tin, Inc. v. First Look Studios, Inc., 671 F. Supp. 2d 893, 901 (S.D. Tex. 2009)

---

[24] The court in DeClemente v. Columbia Pictures Indus., 860 F. Supp. 30, 52 (E.D.N.Y. 1994), dismissed the plaintiff's Lanham Act claims alleging, inter alia, that the title of the film "The Karate Kid" infringed his rights under the Lanham Act.  The court gave some examples of the sort of title that might have been "explicitly misleading" under Rogers - "The Karate Kid, an authorized biography" or "Bill DeClemente: the Karate Kid."

(dismissing Lanham Act claims against film studios in part because "'Defendants' use of the term 'Rin Tin Tin' described the content of the film []. 'Rin Tin Tin' was not a source identifier anywhere on the DVD cover or within the film, itself. []In fact, the only listed source identifiers on the DVD cover, disc, and within the film, itself, were [defendants] First Look Studios, Nu Image, Inc., M3 Media, Inc., and Millennium Films") (citation omitted); Cummings v. Soul Train Holdings LLC, 67 F. Supp. 3d 599, 606 (S.D.N.Y. 2014) (dismissing Lanham Act claim with prejudice under Rogers where defendants' "trademarks 'Soul Train' and 'Time Life' [were] prominently displayed on the DVD sets' packaging and contents.")

When measured against the "explicitly misleading" standard, it is not just *implausible*, but *inconceivable*, that the use of "Loisaidas" as the title of the Film – with the repeated use of "Damon Dash Studios Presents" and a logo which couples the title with a handgun[25] – could "dup[e] consumers into buying a product [i.e., the Film] they mistakenly believe is sponsored by the trademark owner [i.e., the Plaintiff and/or his Bachata musical duo]." E.S.S. Entm't 2000, 547 F.3d at 1100 (citation and quotation omitted).  See, e.g., Arrow Prods., Ltd. v. Weinstein Co., 44 F. Supp. 3d 359, 373 (S.D.N.Y. 2014) (granting 12(c) motion dismissing Lanham Act claims based on use of plaintiff's registered mark "Lovelace" as title of film because plaintiff could not plausibly allege that consumers were likely to be confused into thinking that plaintiff was involved in production of defendants' film).

Thus, the Film's title is protected artistic expression, which the Amended Complaint does not – and could not plausibly – allege is explicitly misleading.  See Stewart Surfboards, Inc. v. Disney Book Grp., LLC, No. 10-cv-2982 (GAF SSx), 2011 U.S. Dist. LEXIS 155444, at *27-28 (C.D. Cal. May 11, 2011) (plaintiff failed to allege that defendant's use of plaintiff's mark on

---

[25] See Exhibit 21 to West Amended Answer.

book cover had explicitly misled and book itself refuted any such contention, so that plaintiff could not state a plausible claim).[26]

## III.   THE FILM'S USE OF "LOISAIDAS" IS A NONACTIONABLE FAIR USE

Plaintiff admits that he did not invent his alleged trademark, but that it was "derived from the Latino pronunciation of Lower East Side."  (See Ex. 19 to West Amended Answer.)  The four decades of use of "Loisaida" – from popular culture (such as its use for an unrelated musical group and in book and record albums), to New York City's "official recognition" of the neighborhood's name (including naming Avenue C "Loisaida Avenue") – is well established. The primary meaning of "Loisaida" and "Loisaidas" to refer to the neighborhood and its residents existed prior to and independent of Medina and the musical duo that performs under his alleged trademark.  It is this meaning of the term that the Film employs.[27]

In light of the above, Plaintiff's Lanham Act claims are precluded by the fair use exception to trademark infringement, as set forth in Section 33(b)(4) of the Lanham Act, 17 U.S.C. §1115(b)(4), because the Film uses "Loisaidas" in its primary and descriptive sense.  As

---

[26] Plaintiff's counsel argued at the pretrial conference that the Court must consider the Polaroid factors to assess likelihood of confusion (per Twin Peaks Prods., Inc. v. Publications Int'l Ltd., 996 F.2d 1366 (2d Cir. 1993)). However, Plaintiff failed to note that the Second Circuit held in Twin Peaks that "the finding of likelihood of confusion must be *particularly compelling* to outweigh the First Amendment interest recognized in Rogers." Id. at 1379 (emphasis added).  See also Louis Vuitton Mallatier, 868 F. Supp. 2d at 181-82; Syler v. Woodruff, 610 F. Supp. 2d 256, 265 (S.D.N.Y. 2009); Lemme v. NBC, 472 F. Supp. 2d 433, 446 (E.D.N.Y. 2007).  For the reasons set forth herein, Plaintiff has failed to plead a legally sufficient claim under even the everyday Iqbal standard.  Since he could not possibly offer plausible allegations meeting the heightened "particularly compelling" threshold, the Amended Complaint should be dismissed with prejudice.

The Stewart Surfboards court, noting that First Amendment considerations require that any alleged likelihood of confusion be "particularly compelling," concluded that the book jacket at issue in that case itself led ineluctably to the conclusion that no "particularly compelling" showing could be made, and dismissed the complaint lest the plaintiff be allowed to "chill artistically relevant expressive uses…" Id. at *25.  The court observed that "[a]llowing trademark law to restrict artistic uses of trademarks that do not explicitly mislead in this way [i.e., by "explicit misstatement"] would unnecessarily impair First Amendment rights," and dismissed the complaint.  Id.  It is respectfully submitted that the same principles apply here, and that Plaintiff should not be allowed to "impair First Amendment rights" and "chill artistically relevant expressive uses" of "Loisaidas," over which no one should be permitted to exert exclusivity in the realm of artistic expression.

[27] For the reasons discussed above, any suggestion that the Film's creators wanted the public to think that it was either about or a product of the Bachata musical duo that uses Plaintiff's mark would be frivolous.

the Supreme Court explained in <u>KP Permanent Make-Up, Inc. v. Lasting Impression I, Inc.</u>, 543

U.S. 111, 122 (2004), the Lanham Act was not intended "to deprive commercial speakers of the

ordinary utility of descriptive words."  The Court stated:

> Since the burden of proving likelihood of confusion rests with the plaintiff, and
> the fair use defendant has no free-standing need to show confusion unlikely, it
> follows … that some possibility of consumer confusion must be compatible with
> fair use, and so it is. The common law's tolerance of a certain degree of confusion
> on the part of consumers followed from the very fact that in cases like this one an
> originally descriptive term was selected to be used as a mark, not to mention the
> <u>undesirability of allowing anyone to obtain a complete monopoly on use of a
> descriptive term simply by grabbing it first</u>. The Lanham Act adopts a similar
> leniency, there being <u>no indication that the statute was meant to deprive
> commercial speakers of the ordinary utility of descriptive words. "If any
> confusion results, that is a risk the plaintiff accepted when it decided to identify
> its product with a mark that uses a well known descriptive phrase."</u> <u>Cosmetically
> Sealed Industries, Inc. v. Chesebrough-Pond's USA Co.</u>, 125 F. 3d at 30.

(543 U.S. at 121-22; emphasis supplied; internal citations omitted.)

The court in <u>Hensley Mfg. v. ProPride, Inc.</u>, 579 F.3d 603 (6th Cir. 2009), affirmed a

12(b)(6) dismissal of Lanham Act claims based on fair use.  The Court noted that the likelihood

of confusion analysis "involves a preliminary question: whether the defendants 'are using the

challenged mark in a way that identifies the source of their goods.' … <u>If they are not, then the

mark is being used in a "'non-trademark' way" and trademark infringement laws, along with the

eight-factor analysis, do not even apply</u>."  <u>Id.</u> at 610 (emphasis supplied), quoting <u>Interactive

Prods. Corp. v. A2Z Mobile Office Solutions, Inc.</u>, 326 F.3d 687, 694 (6th Cir. 2003) (internal

citation omitted).[28]  Thus, the court held, even if the plaintiff could have shown likelihood of

confusion, its trademark infringement claim would be barred:

> Under the fair use doctrine, "the holder of a trademark *cannot* prevent others from
> using the word that forms the trademark in its *primary* or *descriptive* sense."
> <u>Herman Miller,</u>

---

[28] The court observed that the Second Circuit had applied essentially the same logic in a case involving personal
names.  <u>See</u> <u>id.</u> at 610, referring to <u>Madrigal Audio Laboratories v. Cello, Ltd.</u>, 799 F.2d 814, 816 (2d Cir. 1986).

Inc. v. Palazzetti Imports and Exports, Inc., 270 F.3d 298, 319 (6th Cir. 2001). Rather,

> [t]he only right of exclusion that trademark law creates in a descriptive word is in the secondary, new, 'trademark' meaning of the word that plaintiff has created. The original, descriptive primary meaning is always available for use by others to describe their goods, in the interest of free competition.
>
> Id. (quoting J. Thomas McCarthy, McCarthy on Trademarks & Unfair Competition § 11:45 (4th ed.1996)); see also Car-Freshner Corp. v. S.C. Johnson & Son, Inc., 70 F.3d 267, 270 (2d Cir. 1995). ("[F]air use permits others to use a protected mark to describe aspects of their own goods, provided the use is in good faith and not as a mark."). The fair use defense contemplates and tolerates "some possibility of consumer confusion." KP Permanent, 543 U.S. at 121, 125 S.Ct. 542.

(Id. at 612; emphasis in original and added.)[29]  The court affirmed the district court's dismissal based on the Iqbal standard.  Id. at 613.

Similarly, the court in Naked Cowboy v. CBS, 844 F. Supp. 2d 510 (S.D.N.Y. 2012), dismissed the plaintiff's trademark claim on a Rule 12 motion based on fair use.  The court held:

> Here, the challenged phrase "Naked Cowboy" is an example of non-trademark use. It is clear that CBS used the phrase in an effort to describe the contents of the video clip, not as a mark to identify the source of the video clips. See Arnold v. ABC, Inc., No. 06 Civ. 1747, 2007 U.S. Dist. LEXIS 5802, 2007 WL 210330, at *2-*3 (S.D.N.Y. Jan. 29, 2007). The fact that the Episode's source is CBS and not Plaintiff is clearly evidenced by the prominent display of the series' title and CBS's own recognizable "Eye" logo, as well as the short caption beneath the clip which references only named characters on the series. Cosmetically Sealed Indus., Inc. v. Chesebrough-Pond's USA Co., 125 F.3d 28, 30-31 (2d Cir. 1997); Arnold, 2007 U.S. Dist. LEXIS 5802, 2007 WL 210330, at * 3.

(Id. at 515-16; emphasis added.)

As in Naked Cowboy, in the present case the term "Loisaidas" is not used to identify the source of the Film, which is plainly stated to be from "Damon Dash Studios" (see Exs. 20 and 21

---

[29] Plaintiff's suggestion that dismissal on this motion is precluded by a need to evaluate likelihood of confusion also fails for this reason, because the fair use doctrine makes this consideration irrelevant.

to West Amended Answer), but, as titles typically do, to convey something about the Film's content.  Plaintiff's Lanham Act claims should, therefore, similarly be dismissed.

## IV.   PLAINTIFF'S STATE LAW CLAIMS FAIL AS A MATTER OF LAW

Medina's state law claim – which merely adds a litany of conclusory labels regarding New York common law to the same allegations offered in the Lanham Act claims – fails as a matter of law for the same reason that Medina's Lanham Act claims must fail.  It is well settled that state law trademark claims will fail where, as here, they are "based on the same permissible conduct as [a] Lanham Act claim."  Louis Vuitton, 868 F. Supp. 2d at 184; see also Charles Atlas, Ltd. v. DC Comics, Inc., 112 F. Supp. 2d 330, 341 (S.D.N.Y. 2000); cf. Louis Vuitton Malletier v. Dooney & Bourke, Inc., 561 F. Supp. 2d 368, 381 (S.D.N.Y. 2008) (noting that the elements of unfair competition "mirror" the Lanham Act, except that plaintiffs must additionally show bad faith on the state law claim); Tri-Star Pictures, Inc. v. Unger, 14 F. Supp. 2d 339, 363 (S.D.N.Y. 1998) (federal trademark claims and common law unfair competition claims "are almost indistinguishable.") (citations omitted); Yankee Publ'g Inc. v. News Am. Publ'g Inc., 809 F. Supp. 267, 282 (S.D.N.Y. 1992) ("[T]he same First Amendment considerations that limit a cause of action under the Lanham Act apply also to a cause of action under New York law.").  Thus, because the allegations supporting Medina's state common law unfair competition claims are identical to the allegations supporting Medina's Lanham Act claims, those claims should be dismissed for the same reasons.

Similarly, to the extent that Plaintiff purports to allege an equitable claim for unjust enrichment, that claim should be dismissed because he has not and cannot sufficiently allege a cognizable federal or state trademark claim.  Specifically, because Defendants' use of the term "Loisaidas" as the title for the Film does not constitute an actionable trademark violation under

20

either federal or state law, Medina cannot plausibly allege either that Defendants were enriched

at his expense or that "equity and good conscience" dictate that he obtain the damages he seeks

in this action.  See BanxCorp v. Costco Wholesale Corp., 723 F. Supp. 2d 596, 618 (S.D.N.Y.

2010) ("'To 'prevail on a claim of unjust enrichment, Plaintiffs must show that 1) Defendants

were enriched; 2) at Plaintiffs' expense; and 3) it is against equity and good conscience to permit

Defendants to retain what is sought to be recovered.'") (quoting American Med. & Life Ins. Co.

v. CrossSummit Enters., 27 Misc. 3d 1210(A), 2010 N.Y. Misc. LEXIS 760, at ***12 (Sup. Ct.

Apr. 1, 2010)).  In other words, Medina's unjust enrichment claim fails because Defendants have

done nothing wrong and he is not entitled to any profits from the Film.

## V.     THE AMENDED COMPLAINT SHOULD BE DISPOSED OF ON THIS MOTION

Trademark claims are subject to dismissal as a matter of law where a defendant's First

Amendment rights are implicated "because if a suit entails 'long and expensive litigation,' then

the protective purpose of the First Amendment is thwarted even if the defendant ultimately

prevails."  Farah v. Esquire Magazine, 736 F.3d 528, 535 (D.C. Cir. 2013) (quoting Washington

Post Co. v. Keogh, 365 F.2d 965, 968 (D.C. Cir. 1966)); Dombrowski v. Pfister, 380 U.S. 479,

487 (1965) ("[t]he chilling effect upon the exercise of First Amendment rights may derive from

the fact of the prosecution [of a lawsuit], unaffected by the prospects of its success or failure.").

See Stewart Surfboards, 2011 U.S. Dist. LEXIS 155444, at *25 (dismissing complaint with

prejudice lest plaintiff be permitted to "chill artistically relevant expressive uses").

Notably, the court in Louis Vuitton rejected the plaintiff's argument that the Rogers test

could not be assessed on a Rule 12 motion, holding that pre-discovery dismissal of trademark

claims is appropriate "where simply looking at the work itself, and the context in which it

appears, demonstrates how implausible it is that a viewer will be confused into believing that the

plaintiff endorsed the defendant's work (and without relying on the likelihood of confusion factors to do so)."  868 F. Supp. 2d at 183.[30]  See also Eastland Music Grp. LLC v. Lionsgate Entm't, Inc., 707 F.3d 869, 872 (7th Cir. 2013), cert. denied, 134 S. Ct. 204 (U.S. 2013) (12(b)(6) dismissal of trademark claim regarding film title because plaintiff "could not plausibly [ ] allege" consumer confusion).

It is respectfully submitted that Plaintiff's claims should be dismissed as barred by the First Amendment, the Rogers doctrine and fair use.

## CONCLUSION

Plaintiff's overreaching claims – by which he seeks to monopolize a term that preceded Plaintiff's use *by decades*, and which is used in the Film, consistent with its primary and original meaning, to refer to a neighborhood and its denizens – should be dismissed.  Plaintiff's claims must fail not *only* because the Amended Complaint fails to meet the Iqbal standards, or because Plaintiff's attempt to chill protected speech is repugnant to First Amendment principles, or even because the fair use doctrine precludes them.  Plaintiff's claims must also fail because they defy common sense.  Taken to their logical conclusion, Plaintiff's claims would mean that the musical groups "Chicago," "Boston," "Kansas" or "Alabama" would have the right to stop (and/or profit from) films using these geographical names,[31] even if the films had nothing to do with those bands.  Merely stating such a proposition demonstrates why it must be rejected.

---

[30] The Louis Vuitton court stated  "[i]n a case such as this one, no amount of discovery will tilt the scales in favor of the mark holder at the expense of the public's right to free expression."  868 F. Supp. 2d at 184.

[31] As Woody Allen's "Manhattan" demonstrates, the notion of films with such titles requires little stretch of the imagination.  In fact, there was a 1988 feature film entitled "Kansas," starring Matt Dillon and Andrew McCarthy (see http://www.imdb.com/title/tt0095428/?ref_=fn_al_tt_1), and a 2010 television movie entitled "Alabama" (see http://www.imdb.com/title/tt1706627/?ref_=fn_al_tt_1).  There are both a musical group and a 2009 film called "America."  (See http://www.venturahighway.com/index.php?module=pagemaster&PAGE_user_op=view_page&PAGE_id=9&MMN_position=49:49 and http://www.imdb.com/title/tt1347508/?ref_=fn_al_tt_2).  There is also a punk rock bank called "Defiance, Ohio" and a 2005 film entitled "The Prize Winner of Defiance, Ohio" (see http://www.imdb.com/title/tt0406158/?ref_=fn_al_tt_1).

For all of the foregoing reasons, West respectfully requests that his motion pursuant to Rule 12(c) for judgment on the pleadings be granted, and that the Amended Complaint be dismissed in its entirety.

Dated: New York, New York
      August 7, 2015

                    Respectfully submitted,

                    PRYOR CASHMAN LLP

                    Brad D. Rose
                    Tom J. Ferber
                    Dyan Finguerra-DuCharme
                    7 Times Square
                    New York, New York 10036
                    Telephone: (212) 421-4100
                    Fax: (212) 326-0806
                    brose@pryorcashman.com
                    dfinguerra-ducharme@pryorcashman.com
                    tferber@pryorcashman.com

                    *Attorneys for Defendant Kanye West*