**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF NEW YORK**

MICHAEL A. MEDINA,

Plaintiff,

    -against-

DASH FILMS INC., DAMON DASH
PROMOTIONS LLC, DAMON DASH MUSIC
GROUP LLC, DAMON DASH ENTERPRISES I
LLC, DAMON DASH AND KANYE WEST,

Defendants.

Civil Action No.
1:15-cv-02551 (KBF)

**DEFENDANT WEST'S MEMORANDUM OF LAW IN SUPPORT OF**
**HIS MOTION TO DISMISS THE SECOND AMENDED COMPLAINT**

Brad D. Rose
Tom J. Ferber
Dyan Finguerra-DuCharme
PRYOR CASHMAN LLP
7 Times Square
New York, New York 10036
Tel.: (212) 421-4100
Fax: (212) 798-6307

*Attorneys for Defendant Kanye West*

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................................................. ii

PRELIMINARY STATEMENT ......................................................................................... 1

FACTS ................................................................................................................................. 3

    The Terms "Loisaida" and "Loisaidas" ..................................................................... 3

    The *Loisaidas* Film ...................................................................................................... 4

    Plaintiff's Allegations ................................................................................................... 9

ARGUMENT ...................................................................................................................... 10

    I.    THE SAC DOES NOT STATE A LEGALLY COGNIZABLE
          CLAIM AND ITS ALLEGATIONS ARE BELIED BY THE FILM ........................... 10

    II.   THE FILM'S TITLE IS PROTECTED BY THE
          FIRST AMENDMENT, WHICH BARS PLAINTIFF'S
          LANHAM ACT CLAIMS AS A MATTER OF LAW ................................................ 13

          A.   Motion Pictures Are Protected Speech Under The First Amendment ................. 13

          B.   The *Rogers* Test ................................................................................................ 14

               1.   The Title "*Loisaidas*" Has Clear
                    Artistic Relevance To The Film's Story ...................................................... 16

               2.   The Film's Title Is Not Explicitly Misleading .............................................. 18

    III.  THE FILM'S USE OF "LOISAIDAS" IS A NONACTIONABLE FAIR USE ........... 21

    IV.  PLAINTIFF'S STATE LAW CLAIM FAILS AS A MATTER OF LAW ................. 23

    V.   THE SAC SHOULD BE DISPOSED OF ON THIS MOTION .................................. 24

CONCLUSION ................................................................................................................... 25

**TABLE OF AUTHORITIES**

**CASES**                                                                              **PAGES(s)**

Arrow Prods. v. Weinstein Co.,
    44 F. Supp. 3d 359 (S.D.N.Y. 2014) ................................................................ 20

Ashcroft v. Iqbal,
    556 U.S. 662 (2009) ...................................................................................... 11

Bell Atl. Corp. v. Twombly,
    550 U.S. 544 (2007) ...................................................................................... 10

Blue Tree Hotels Inv. (Can.), Ltd. v. Starwood Hotels & Resorts Worldwide, Inc.,
    369 F.3d 212 (2d Cir. 2004)............................................................................12

Brooklyn Heights Ass'n, Inc. v. National Park Serv.,
    777 F. Supp. 2d 424 (E.D.N.Y. 2011) ...............................................................3

Brown v. Electronic Arts, Inc.,
    No. 2:09-cv-01598-FMC-RZx, 2009 U.S. Dist. LEXIS 131387
    (C.D. Cal. Sept. 23, 2009) ............................................................................ 18

Canal+ Image UK, Ltd. v. Lutvak,
    773 F. Supp. 2d 419 (S.D.N.Y. 2011)................................................................12

Charles Atlas, Ltd. v. DC Comics, Inc.,
    112 F. Supp. 2d 330 (S.D.N.Y. 2000) ............................................................. 23

Clark v. United States,
    No. 13-490C, 2015 U.S. Claims LEXIS 750 (Fed. Cl. June 12, 2015) ...................12

In re Cooper,
    254 F.2d 611 (C.C.P.A. 1958) ...................................................................... 19

Cummings v. Soul Train Holdings LLC,
    67 F. Supp. 3d 599 (S.D.N.Y. 2014) ...........................................................13, 20

DeClemente v. Columbia Pictures Indus.,
    860 F. Supp. 30 (E.D.N.Y. 1994) .................................................................. 19

Dillinger, LLC v. Electronic Arts, Inc.,
    No. 1:09-cv-1236-JMS-DKL, 2011 U.S. Dist. LEXIS 64006
    (S.D. Ind. June 16, 2011) ...................................................................... 17, 18

Dombrowski v. Pfister,
    380 U.S. 479 (1965) ...................................................................................... 24

<u>**CASES**</u>                                                                         <u>**PAGES(s)**</u>

E.S.S. Entm't 2000, Inc. v. Rock Star Videos, Inc.,
    547 F.3d 1095 (9th Cir. 2008) ................................................................. 16, 18, 20

ETW Corp. v. Jireh Publ'g,
    332 F.3d 915 (6th Cir. 2003) ................................................................. 16

Eastland Music Group, LLC v. Lionsgate Entm't, Inc.,
    707 F.3d 869 (7th Cir. 2013), <u>cert. denied</u>, 134 S. Ct. 204 (U.S. 2013)................................. 24

Farah v. Esquire Magazine,
    736 F.3d 528 (D.C. Cir. 2013) ................................................................. 24

Fortres Grand Corp. v. Warner Bros. Entm't, Inc.,
    947 F. Supp. 2d 922 (N.D. Ind. 2013), <u>aff'd</u>, 763 F.3d 696 (7th Cir. 2014) ......................... 19

Gallagher v. Lions Gate Entm't, Inc.,
    No. 15-cv-02739-ODW, 2015 U.S. Dist. LEXIS 122441 (C.D. Cal. Sept 11, 2015) ............12

Gottlieb Dev. LLC v. Paramount Pictures Corp.,
    590 F. Supp. 2d 625 (S.D.N.Y. 2008)......................................................................12

Hensley Mfg. v. ProPride, Inc.,
    579 F.3d 603 (6th Cir. 2009) ......................................................................... 21, 22

Hicks v. Casablanca Records,
    464 F. Supp. 426 (S.D.N.Y. 1978) ................................................................. 14

Interactive Prods. Corp. v. A2Z Mobile Office Solutions, Inc.,
    326 F.3d 687 (6th Cir. 2003) ................................................................. 22

International Audiotext Network v. AT&T,
    62 F.3d 69 (2d Cir. 1995)......................................................................12

Joseph Burstyn, Inc. v. Wilson,
    343 U.S. 495 (1952) ................................................................. 14

KP Permanent Make-Up, Inc. v. Lasting Impression I, Inc.,
    543 U.S. 111 (2004) ................................................................. 21

Kramer v. Time Warner, Inc.,
    937 F.2d 767 (2d Cir. 1991)......................................................................3

L-7 Designs, Inc. v. Old Navy, LLC,
    647 F.3d 419 (2d Cir. 2011) ................................................................. 13

**CASES**                                                                                          **PAGES(s)**

Lemme v. NBC,
    472 F. Supp. 2d 433 (E.D.N.Y. 2007) ................................................................. 21

Leopold v. Levin,
    45 Ill. 2d 434 (1970) ................................................................................................14

Louis Vuitton Mallatier S.A. v. Warner Bros. Entm't Inc.,
    868 F. Supp. 2d 172 (S.D.N.Y. 2012) ........................................................... *passim*

Louis Vuitton Malletier v. Dooney & Bourke, Inc.,
    561 F. Supp. 2d 368 (S.D.N.Y. 2008) ................................................................. 23

Madrigal Audio Labs. v. Cello, Ltd.,
    799 F.2d 814 (2d Cir. 1986) ................................................................................. 22

Mattel, Inc. v. MCA Records,
    296 F.3d 894 (9th Cir. 2002) ......................................................................... 16, 18

Naked Cowboy v. CBS,
    844 F. Supp. 2d 510 (S.D.N.Y. 2012) ........................................................... 22, 23

Puerto Rico v. Shell Oil Co. (In re MTBE Prods. Liab. Litig.),
    No. 1:00-1898 (SAS), 2013 U.S. Dist. LEXIS 181837 (S.D.N.Y. Dec. 30, 2013) ...................3

Rin Tin Tin, Inc. v. First Look Studios, Inc.,
    671 F. Supp. 2d 893 (S.D. Tex. 2009) ................................................................. 19

Rogers v. Grimaldi,
    695 F. Supp. 112 (S.D.N.Y. 1988), aff'd, 875 F.2d 994 (2d Cir. 1989) ............................... 14

Rogers v. Grimaldi,
    875 F.2d 994 (2d Cir. 1989) ........................................................... 14, 15, 18, 19

Roxbury Entm't v. Penthouse Media Group, Inc.,
    669 F. Supp. 2d 1170 (C.D. Cal. 2009) ................................................... 16, 17, 19

Schad v. Mount Ephraim,
    452 U.S. 61 (1981) ................................................................................................. 14

Stewart Surfboards, Inc. v. Disney Book Group, LLC,
    No. CV 10-2982 GAF (SSx), 2011 U.S. Dist. LEXIS 155444
    (C.D. Cal. May 11, 2011) ............................................................................... 20, 24

**CASES**                                                                        **PAGES(s)**

Sugar Busters LLC v. Brennan,
    177 F.3d 258 (5th Cir. 1999) ................................................................ 16

Syler v. Woodruff,
    610 F. Supp. 2d 256 (S.D.N.Y. 2009) ................................................... 21

Technomarine SA v. Jacob Time, Inc.,
    905 F. Supp. 2d 482 (S.D.N.Y. 2012) ...................................................11

Technomarine SA v. Jacob Time, Inc.,
    No. 12 civ. 0790 (KEF), 2012 U.S. Dist. LEXIS 90261 (S.D.N.Y. June 22, 2012) ............. 13

Tri-Star Pictures, Inc. v. Unger,
    14 F. Supp. 2d 339 (S.D.N.Y. 1998) .....................................................23

Twin Peaks Prods. v. Publ'ns Int'l,
    996 F.2d 1366 (2d Cir. 1993) .......................................................... 20, 21

Valencia v. Universal City Studios LLC,
    No. 1:14-CV-00528-RWS, 2014 U.S. Dist. LEXIS 174644
    (N.D. Ga. Dec. 18, 2014) ..............................................................16, 19

Washington Post Co. v. Keogh,
    365 F.2d 965 (D.C. Cir. 1966) ............................................................ 24

Woodard v. Jackson,
    No. 1:03-cv-0844-DFH, 2004 U.S. Dist. LEXIS 6292 (S.D. Ind. Mar. 25, 2004) .......... 17, 18

Yankee Publ'g v. News Am. Publ'g,
    809 F. Supp. 267 (S.D.N.Y. 1992) .......................................................23

**STATUTES**

Fed. R. Civ. P. 12(b)(6)...........................................................1, 10, 17, 24

15 U.S.C. § 1125(a) ...............................................................................10

17 U.S.C. § 1115(b)(4) ........................................................................ 21

Defendant Kanye West ("West") respectfully submits this memorandum of law in support of his motion to dismiss the Second Amended Complaint ("SAC") of plaintiff Michael Medina ("Medina" or "Plaintiff") pursuant to Federal Rule of Civil Procedure 12(b)(6).

## PRELIMINARY STATEMENT

This action concerns the film entitled "Loisaidas" ("*Loisaidas*" or the "Film"). The Film depicts a Harlem drug dealer's move to Manhattan's Latino Lower East Side, which has long been called "Loisaida," as well as the cold-blooded killings and crooked cop that he embraces along the way. Plaintiff Medina acknowledges that "Loisaidas" is well-known slang for "lower east siders" – indeed, the term is 40 years old, is officially recognized by New York City, and is abundant in popular culture – but he nevertheless claims to own a monopoly on the term because he uses it for a Latino musical duo that hails from that neighborhood. (See SAC at Ex. B.)

In response to West's earlier dispositive motion against the first amended complaint ("FAC"), which was based on the absence of plausible factual allegations and the preclusion of Plaintiff's claims as a matter of law based on the First Amendment and the fair use doctrine, Plaintiff offered the SAC. The SAC attempts to make an end run around the First Amendment defense by substituting the term "music video" where the FAC had used "film" to describe *Loisaidas*. The SAC thereby offers the patent fiction that *Loisaidas* is a "music video" "providing gangsta rap by a group known as Loisaidas," implying that, as such, it somehow loses the protections afforded artistic expression. (See, e.g., SAC ¶¶ 1, 75.)

Plaintiff's amendment cannot perform alchemy and transmute legally insufficient claims into cognizable ones, however, because the subject of those claims – the Film – remains unchanged. A review of the Film, which is integral to the SAC, demonstrates that it is no "music video" at all, but a narrative- and plot-driven motion picture depicting, as Plaintiff describes it, "a

violent gangster-infused world" with "drug dealing, mob wars, and murder."[1]  (SAC ¶¶ 5, 55.) The Film does not present a "gangsta rap … group known as Loisaidas"; in fact, only a small fraction of three of its eight chapters feature any rapping at all, and in each instance the rapping is by an individual, not a group.  That the Film occasionally depicts characters rapping – which is an element of the culture being portrayed – no more makes the Film a "music video" than did Eminem's rapping in the film *8 Mile*.  Moreover, music videos are themselves artistic expression entitled to First Amendment protection.  Taking Plaintiff's proposition to its logical conclusion reveals its fallacy.  If singing as part of a film's story-telling turned a protected "film" into an unprotected "music video," as Plaintiff suggests, then, for example, Julie Andrews' singing in *The Sound of Music* and Barbra Streisand's singing in *Yentl* would have that effect.  Moreover, while Plaintiff complains about the existence of a "soundtrack" for the Film (see SAC at ¶ 76), soundtracks are offered in connection with films, not "music videos" (which concern a single sound recording, not a collective album of all the music in the film.)

Thus, Plaintiff's strategic use of palpably misleading descriptions of the Film in the SAC are undermined by the Film's content, and the SAC is no more sustainable than its predecessor.

---

[1] A music video, which is simply a short musical film, offers a dramatic rendition of the lyrics of – and bears the same title as – a single popular song.

## FACTS

### The Terms "Loisaida" and "Loisaidas"

As Plaintiff admits, "Loisaidas" is "the Spanish slang term for 'lower east siders.'"  (Ex. B to SAC.)  That term is derived from "Loisaida" which, similarly, is Latino slang for "Lower East Side,"[2] as has been officially recognized in public documents of New York City agencies.[3]  Thus, in a 2009 report, the Landmarks Preservation Commission ("LPC"),[4] discussing the "20th-Century History of the East Village," noted that "[t]he community named itself Loisaida to symbolize the second generation Hispanic roots that had developed in the context of the African-American and Latino movements for social and economic justice, equality, and identity."  As Plaintiff has acknowledged, Avenue C in that neighborhood has long been referred to as "Loisaidas Avenue."[5]  There is also a "Loisaida Street Carnival."  (See NYPD Press Release No. 2006-024 at http://www.nyc.gov/html/nypd/html/pr/pr_2006_024.shtml).[6]

---

[2] Plaintiff specifically alleged this in his original Complaint ("Orig. Complt."; ECF Doc 1, at ¶ 11, citing to Exhibit A thereto, on which Plaintiff made handwritten notations emphasizing the origin of the term "Loisaida" in the 1970s and that Avenue C is now referred to as "Loisaida Avenue." See also photo of "Loisaida Av" sign at last page of Ex. A to Orig. Complt).

[3] As discussed further below, any matter of which the court can take judicial notice for the factual background of a case may be considered in a Rule 12(b)(6) motion.  Judicial notice of matters included in government websites is routine.  See Puerto Rico v. Shell Oil Co. (In re MTBE Prods. Liab. Litig.), No. 1:00-1898 (SAS), 2013 U.S. Dist. LEXIS 181837, at *16 (S.D.N.Y. Dec. 30, 2013) ("Courts routinely take judicial notice of data on government websites because it is presumed authentic and reliable.") (citing Kramer v. Time Warner, Inc., 937 F.2d 767, 774 (2d Cir. 1991) (holding that district courts may take judicial notice of the contents of certain public records) and Brooklyn Heights Ass'n, Inc. v. National Park Serv., 777 F. Supp. 2d 424, 432 n.6 (E.D.N.Y. 2011) (taking judicial notice of a city park website); other citation omitted).

[4] See (first PDF, dated Nov. 17, 2009, at p.8) at http://www1.nyc.gov/home/search/index.page?search-terms=aschenbroedel%20verein%20later%20gesangverein&pdfs=true&start-number=0.  This LPC report concerned the building which housed the La Mama Experimental Theatre Club.)  See also http://www.nycmanhattan.org/p/loisaida-avenue.html (explaining background of "Loisaida" in 1974 and that "Loisaida Avenue is now an alternative for Avenue C").

[5] See Ex. A to Orig. Complt.  See also http://www.nytimes.com/interactive/2012/09/02/nyregion/a-history-of-new-york-in-50-objects.html); http://gvshp.org/blog/2011/06/14/umbrella-umbrella/ (Blog of Greenwich Village Society For Historic Preservation, June 14, 2011 article entitled "Umbrella, Umbrella!).

[6] The internet is replete with the decades-long use of "Loisaida"  in popular culture – starting long before Medina's use.

**The *Loisaidas* Film**

The Film states that it is presented by "Damon Dash Studios."  It has eight chapters, each of which states "Damon Dash Studios Presents"[7] at the beginning.[8]

Chapter I:  The film opens with the following text on a black background (one line at a time):

There is a place
Where there are no rules
Where the wrong move can cost a life
A place to get money
And risk dying for it everyday.
**LOISAIDAS**[9]

We see a white BMW enter a dark car wash at night.  Two male characters exit the car and a third character approaches it.  The driver of the car gets out and opens the trunk, but his passenger (Rodrigo "The Monster")[10] points a gun at his head.  Young removes a duffle bag from the trunk and backs away in fear.  Rodrigo then shoots and kills him.

The following text is displayed: "Chapter I: Welcome to **Loisaidas**"

The next scene depicts a customer (the "Customer") chatting with a convenience store clerk.  Another man enters the convenience store and tells the Customer that Rodrigo "The Monster" just got out of jail and suggests that the Customer resolve "it."  The two part ways.

In the next scene, a black SUV enters the car wash at night.  The Customer exits the SUV and goes to an upstairs office, where he talks with Rodrigo and another man.  Rodrigo is angry that he went to prison for doing a "bid" (contract killing) for the Customer, who then only funded his "commissary."  The Customer protests, the two get in a scuffle, and Rodrigo shoots and kills him as he tries to run away.  The following text is then displayed on the screen: "FIN."

---

[7] It sometimes says "Dame Dash Studios Presents."
[8] A copy of the Film is submitted as Exhibit A to the accompanying Declaration of Tom J. Ferber.
[9] The Film's written or spoken use of "Loisaidas" or "Loisaida" are noted in bold.
[10] For the Court's convenience in reviewing the Film, screen shots from the Film identifying various characters are attached  as Exhibit C to the Ferber Declaration.

The next scene begins with the following text on the screen:

Two hustlers from the other side of town<br>
Forced into exodus with blood on their hands<br>
To Carve out their own piece of the pie.<br>
By any means necessary

The Film's central character, drug dealer Remy (played by rapper Murda Mook), is seen rapping, exclaiming that he is "the toughest mother fucka coming up this route" and emphasizes that he is a "bad ma' fucka"  (5:21 to 6:40 of Chapter I, which is 7:10 total).

"Chapter II – The Thing Uptown":  A young man (the "BMX-Rider") rides his BMX bike around the Lower East Side (he passes local landmark Katz's Deli) as the following text is displayed:

The streets are bubbling in the city<br>
One of the young stars of <strong>Loisaidas</strong> makes his way to his OG's[11] spot

We next see the BMX-Rider entering an apartment, where he tells Rugby (played by rapper Smoke DZA) that he wants to talk about the "**Loisaidas** situation."  Rugby responds that he needs to finish rolling his marijuana cigar first.  Rugby then raps (from 1:57 to 3:17 – *i.e.*, 80 seconds of the 11:32 long chapter), describing himself as "hungry like a wolf" and that he's "a prophecy dawg, not to be crossed, n*gga you can't fuck with me, I'm nazi to y'all."

We next see Remy is talking to the "uptown executioner" Dee, as they count money and talk about the streets of Harlem.  They decide to go back to their "old school tactics" to keep Remy on top and to stop others from interfering with their business.

We next see Rugby playing cards with a character named Roddo and another man.  The narrator[12] explains that Roddo, who owes money to Remy, is being set up.  Remy and another man join the game.  Remy asserts that Roddo "played him," so he's going to play a game to get

---

[11] "OG" is urban slang for "original gangster" or "old-school ganster."
[12] The narrator seems to be Rugby.

his money back.  They play "high card," and Remy wins with the highest card.  Remy shoots and kills Roddo's friend, and after he wins the next hand he kills Roddo.  We then see Dee in the room, spitting on Roddo's dead body and stating that he now needs to clean up the carnage.

The narrator explains that after this triple murder, things got "too hot" uptown and Remy's gang needed to find a new place to hustle, "somewhere where nobody from uptown would expect to find two of their own."

Chapter III – The New Guys:  The narrator says: "We hit up our homie "Blackface" downtown in **Loisaidas**."  "The **Loisaidas** n*ggas don't like us Harlem n*ggas."

Remy, Rugby and "Blackface" discuss Remy's plan to bring his drug business to Loisaidas, which is filled with drug users.

The narrator says: "**Loisaidas** has everything kind of thing you could think of. . . Turns out, **Loisaidas** was the place to be."

The scene shifts to a "neighborhood crack fiend" (as he is described in the credits) talking about his experience with drugs and crack.  We next see another man ("neighborhood coke fiend," per the credits) on a bench describing how to smoke coke using a cigarette (a "cooley").

Chapter IV – The Battle for Jackson Park:  The narrator explains that the hard part is not getting started, but keeping the business, and that the easiest way to cross the line is to talk about somebody's kid.

Remy, Blackface and two other men are at a park at night, making small talk and watching Remy's kid play basketball.  Another man approaches Remy and his crew.  He is a competitor dealer looking to do business in the area.  He says that he now knows where Remy's kid goes to school.  Remy, responding to the threat, pulls out his gun and shoots the would-be competitor.

We see a montage of locations in Loisaidas, while the narrator explains that everyone in the "hood" was going after Remy's gang and they were regularly in gun fights with competitors.

Chapter V – A New Day:  Remy is ordering food at a Latino restaurant.  He begins talking to a young woman, "Yolanda."  Remy tells Yolanda that he wants to bring her to Harlem, where he's from, but she is not interested.

The narrator explains that Remy has "locked the park down and started planting seeds" – *i.e.*, he is expanding his drug business in the area.  We then see 11 men, including Remy and Blackface, making small talk on park benches.  We see a flashback of one of the men (the "Former Addict") playing cards with a woman while he does cocaine.  She gets angry at him for doing cocaine and throws the cocaine at his face.

After the flashback, the Former Addict states that he doesn't use cocaine anymore, and he's only interested in making money.

The next scene shows Remy, the Former Addict and three other men sitting on park benches at Forsyth Park (per the credits) at night.  Two competitors of Remy approach and there is a dispute over turf.  One of the competitors shoots one of Remy's crew, and Remy's crew responds by killing the two competitors.

Chapter VI – The Warning:  The chapter begins with Lt. Lobo (played by Damon Dash), a dirty cop, talking on a park bench with Remy.

Lobo tells Remy that he should not be in the drug dealing game unless he is willing to work with dirty cops like him. He also explains the benefit of working downtown as opposed to uptown.

The narrator explains how Remy's affiliation with Lobo was the best thing that happened to Remy, as Lobo identified people who were about to "rat" on Remy.

7

The next scene shows a man (the "rat") in an interrogation room telling a police officer that he is willing to reveal what he knows as long as he's protected.  The officer replies that there's a special officer who handles situations like this.  The officer leaves and Lt. Lobo enters the room.  After Lobo gives him some marijuana to smoke, the rat offers to be an informant if Lobo will protect him.  Lobo strikes the rat, excoriating him for being willing to put his friends in jail.  Lobo throws the marijuana joint in the rat's face and walks away.

Chapter VII: Los Soplonitos:  The narrator says that Lobo caught the first "snitch," but that was just the beginning:   "[T]here were seven other cats from **Loisaidas** who was mad enough to bleach the police."  The narrator explains that Lobo connected Remy with some contract killers to deal with other "rats." The first of these assassins are "The Warlocks" from Yonkers.

We see Remy telling The Warlocks that he has three people that he needs taken care of.  We then see The Warlocks killing three customers (presumably snitches) in a small restaurant.

The following scene opens up with the narrator explaining that Lobo also connected Remy with Rodrigo and Lo (from the Film's early scenes), who have been killing everyone they ever worked with (following Rodrigo's release from prison).  There is a flashback to the first scenes, in which Rodrigo killed Casper and Young.

The narrator states that Rodrigo and Lo also killed two of Lobo's rats, which is depicted in the next scene (in which Rodrigo and Lo kill two men as elevator doors open).

We next see Remy rapping, including the lyrics "**Loisaidas** running everything n*gga" and "Give a fuck where you're from n*gga, I'm from **Loisaidas**" (from 2:48 to 4:02).

Chapter VIII: A Clean Cut:  Rugby and the BMX-Rider are on a rooftop during the day overlooking the Empire State Building.  The narrator explains that there are two more rats to find,

and "if you wanna get in the **Loisaidas**, here's your chance. Don't worry you're going to have some help."

We next see Dee (the "uptown executioner" from Chapter II) walking into a barber shop at night while a couple of men are getting haircuts.  Dee walks to the back while the BMX-Rider, who is among those getting haircuts, jumps from his chair and kills one of the other customers. Dee shoots and kills another customer in the back of the shop.  After the shootings, the BMX-Rider exists the barber shop, grabs his bike and rides off in the night, while a satisfied looking Dee walks out.

**Plaintiff's Allegations**

Plaintiff Medina is affiliated with an "Urban Bachata duo"[13] called " Loisaidas."  (See SAC at Ex. B and ¶ 33.)  Medina is not a member of Loisaidas, which consists of Aquiles Nuñez and Isaiah Parker.  Plaintiff's promotional materials state that the musical duo "hail[s] from (NYC) Manhattan's Lower East Side, hence the name Loisaidas – which is the Spanish slang term for 'lower east siders.'"[14]  (Ex. B to SAC; emphasis supplied)

While the FAC repeatedly acknowledged that *Loisaidas* is a "film," the SAC describes it as "a series of short music videos" which "provid[e] gangster rap by a group known as Loisaidas." (SAC at ¶¶ 1, 25.)  The SAC alleges that these so-called "music videos" are intended to "promote the Defendants new gangster rap group."  (SAC at ¶¶ 64, 68.)  Plaintiff alleges that Defendants are infringing his trademark rights by using the "word mark Loisaidas" on, *inter alia*, the film and the soundtrack (the "Soundtrack").[15]

---

[13] Bachata is a Latino genre of music (and dance) that originated in the Dominican Republic.

[14] Medina's Original Complaint (ECF Doc. 1) also acknowledged that "'Loisaida' is a term derived from the Spanish pronunciation of 'Lower East Side,'" and incorporated a Wikipedia article discussing the origins of the term, as set forth above.  (Id. at ¶ 11 and Ex. A.)

[15] The Soundtrack is accessible at http://www.loisaidasddashstudios.com/soundtrack.  For the Court's convenience, a CD with the Soundtrack music and a copy of the cover art for the Soundtrack are submitted as Exhibit B to the accompanying Declaration of Tom J. Ferber.

While it offers no specific facts, the SAC alleges that there has been and will be "actual confusion" between the Film, which it describes as "graphically depict[ing] murder, violence and drug sales," and his musical duo, which performs "Urban Bachata" music.  (SAC ¶¶ 5, 55, 58.)[16] Plaintiff also speculates that consumers are likely to confuse Defendants' graphically violent film about drug dealers with Plaintiff's musical duo.  (SAC at ¶¶ 87, 98.)

Plaintiff obtained a trademark registration for LOISAIDAS as a trademark for the Latino musical duo on January 17, 2012, based on a first use in commerce of November 2008.  (Ex. A to SAC.)  Claiming that defendants have "the express intent of profiting from Plaintiff's valuable registered trademark" – but with no explanation as to how Defendants would benefit by having the Film confused with his musical duo – Plaintiff alleges that Defendants have infringed his registered trademark "in violation of Section 35 [sic] of the Lanham Act, 15 U.S.C. Section 1114(1)."  (SAC at ¶ 88.)  Plaintiff also conclusorily alleges that "Defendants' use of Plaintiff's word mark results in confusion as to sponsorship, association, source and origin of the Plaintiff's and Defendants' products," in violation of Section 43(a) of the Lanham Act (15 U.S.C. §1125 (a)), although he again offers no supporting factual allegations.  (SAC at ¶¶ 94, 106.)  Finally, Plaintiff's third claim alleges various violations of New York State common law.  (SAC at ¶¶ 116-124.)

## ARGUMENT

## I.  THE SAC DOES NOT STATE A LEGALLY COGNIZABLE CLAIM AND ITS ALLEGATIONS ARE BELIED BY THE FILM

In order to survive a Rule 12(b)(6) motion, a complaint must articulate sufficient plausible factual allegations to raise a right to relief beyond a speculative level.  Bell Atl. Corp. v.

---

[16] The SAC presumably fails to offer any specifics about the conclusorily alleged "actual confusion" because there has been none in the six months since the Film became available to the public (see SAC at ¶ 4, alleging beginning of use in March 2015).

<u>Twombly</u>, 550 U.S. 544, 555 (2007).  The Supreme Court clarified this standard in <u>Ashcroft v.</u>

<u>Iqbal</u>, 556 U.S. 662 (2009):

> As the Court held in Twombly, … <u>the pleading standard</u> Rule 8 announces does not require "detailed factual allegations," but it <u>demands more than an unadorned, the-defendant-unlawfully-harmed-me accusation.</u> .. <u>A pleading that offers "labels and conclusions" or "a formulaic recitation of the elements of a cause of action will not do</u>." … Nor does a complaint suffice if it tenders "naked assertion[s]" devoid of "further factual enhancement." <u>Id.</u>, at 557…. To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to "state a claim to relief that is plausible on its face." …. A claim has <u>facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable</u> for the misconduct alleged…. <u>The plausibility standard</u> is not akin to a "probability requirement," but it <u>asks for more than a sheer possibility that a defendant has acted unlawfully</u>…. <u>Where a complaint pleads facts that are "merely consistent with" a defendant's liability, it "stops short of the line between *possibility* and *plausibility* of 'entitlement to relief.'"</u>

556 U.S. at 678 (internal citations omitted; emphasis supplied)

The SAC fails to meet this standard for several reasons.  First, it is replete with precisely the type of "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements" which this Court has held "do not suffice."  <u>Technomarine, SA v. Jacob Time, Inc.</u>, 905 F. Supp. 2d 482, 487 (S.D.N.Y. 2012) (Forrest, J.), quoting <u>Iqbal</u>, 556 U.S. at 678.  The SAC ultimately alleges little more than that (i) Plaintiff uses "Loisaidas"- "which is the Spanish slang for "lower east siders" – for his musical duo, (ii) he has a trademark registration, (iii) the Film uses the same term as its title, and (iv) Defendants used that title despite being advised of Plaintiff's objection to such use (SAC at ¶ 71).  However, since, for the reasons discussed below, the Film and its title are protected artistic expression, none of these offers the sort of plausible factual allegations required for a legally sufficient, cognizable trademark infringement claim.

Second, the SAC's allegations are belied by the Film and the Soundtrack, which are integral to the SAC and may therefore be reviewed by the Court on this motion.  See Gottlieb Dev. LLC v. Paramount Pictures Corp., 590 F. Supp. 2d 625, 630 n. 1 (S.D.N.Y. 2008) (film referred to in and integral to complaint considered on motion to dismiss) (citing Blue Tree Hotels Inv. (Can.), Ltd. v. Starwood Hotels & Resorts Worldwide, Inc., 369 F.3d 212, 217 (2d Cir. 2004) and International Audiotext Network v. AT&T, 62 F.3d 69, 72 (2d Cir. 1995) (court may consider document integral to complaint on motion to dismiss, even if not attached to complaint or incorporated by reference)); see also Canal+ Image UK, Ltd. v. Lutvak, 773 F. Supp. 2d 419, 427 (S.D.N.Y. 2011) ("Where Canal+ repeatedly characterizes or invokes the Novel, the Film, and the Musical in its complaint... it is plain that the Novel, the Film, and the Musical are integral to the complaint. Accordingly, the Court will consider these works for purposes of Defendants' motion to dismiss").

Where, as here, the content of the work at issue is at odds with the plaintiff's allegations purporting to describe that work, the work trumps the plaintiff's descriptions.  See Clark v. United States, No. 13-490C, 2015 U.S. Claims LEXIS 750, at *16 (Fed. Cl. June 12, 2015) (conclusory allegations that work was copied are contradicted by work itself); see, e.g., Gallagher v. Lions Gate Entm't, Inc., No. 15-cv-02739-ODW, 2015 U.S. Dist. LEXIS 122441, at *13-46 (C.D. Cal. Sept 11, 2015) (disregarding allegations in copyright infringement complaint contradicted by the works at issue).  A review of the Film reveals that "Loisaidas" is used for its primary meaning – i.e., in connection with the Latino Lower East Side and its denizens.  Other than as the title, "Loisaidas" is displayed on the screen three times and it is spoken nine times by the Film's characters.[17]  There is no "gangsta rap group" in the Film. And while there are three brief occasions in which characters rap, it is always *individual characters, not a group*, who do

---

[17] These instances are noted by "**Loisaidas**" in bold font in the synopsis of the Film, above.

the rapping (Remy in the chapters I and VII, and Rugby in chapter II).[18]  Thus, Plaintiff's newly-concocted description of the Film as a series of "music videos" intended to promote a "gangsta rap group" is belied by the content of the Film.  Moreover, the Soundtrack identifies individual artists who perform its tracks (most of which are not rapped on screen, but are merely background music), and its artwork shows the Film's title in stylized letters resembling a skyline over a handgun (the "Handgun Logo"),[19] which no one could reasonably confuse with Plaintiff's musical duo.

Finally, and most significantly, the SAC not only fails the applicable pleading standard, but Plaintiff's purported trademark and unfair competition claims – which are based on the Film's title – are precluded as a matter of law by the First Amendment and the fair use exception to trademark infringement.  "Loisaidas" is a well-known, widely used term[20] which the law will not allow Plaintiff to appropriate and monopolize, as he seeks to do in this action.  Moreover, the title of the Film is not, and could not plausibly be claimed to be, its source-denoter.

## II.    THE FILM'S TITLE IS PROTECTED BY THE FIRST AMENDMENT, WHICH BARS PLAINTIFF'S LANHAM ACT CLAIMS AS A MATTER OF LAW

### A.    Motion Pictures Are Protected Speech Under The First Amendment

Artistic expression, such as the Film, is constitutionally protected speech.  The application of the First Amendment's protections to motion pictures and other works of

---

[18] The first rap is 79 seconds of a 7 minute, 10 second chapter.  The second rap is 80 seconds of an 11 minute, 32 second chapter.  The third rap is 74 seconds of a 4 minute, 36 second chapter.  Thus, the three raps occupy less than four minutes of the 58 ½ minute film.

[19] See Ex. B to Ferber Declaration.

[20] The widespread nature of its use is reflected in the documents from NYC.gov referenced above, as well as a wide array of newspaper articles, books, and sound recordings, of which the Court may take judicial notice.  See, e.g., L-7 Designs, Inc. v. Old Navy, LLC, 647 F. 3d 419, 422 (2d Cir. 2011) ("On a 12(c) motion, the court considers the complaint, the answer, any written documents attached to them, and any matter of which the court can take judicial notice for the factual background of the case") (citations & quotations omitted); Technomarine SA v. Jacob Time, Inc., No. 12 civ. 0790 (KEF), 2012 U.S. Dist. LEXIS 90261, at *4 n.1  (S.D.N.Y. June 22, 2012) (court may consider matters of which judicial notice may be taken, including "the fact that a publicly accessible website contains certain information" and of the "fact of its publication" of certain materials); Cummings v. Soul Train Holdings LLC, 67 F. Supp. 3d 599, 602 (S.D.N.Y. 2014).

entertainment has been established since the Supreme Court's decision in Joseph Burstyn, Inc. v. Wilson, 343 U.S. 495 (1952), in which the Court recognized that "[t]he importance of motion pictures as an organ of public opinion is not lessened by the fact that they are designed to entertain as well as to inform." Id. at 501. The Court also held "[t]hat books, newspapers, and magazines are published and sold for profit does not prevent them from being a form of expression whose liberty is safeguarded by the First Amendment." Id. at 501-02. See also Schad v. Borough of Mt. Ephraim, 452 U.S. 61, 65 (1981). ("Entertainment, as well as political and ideological speech, is protected; motion pictures, programs broadcast by radio and television, and live entertainment, such as musical and dramatic works, fall within the First Amendment guarantee") (citations omitted).

Courts across the nation have adhered to this principle when addressing claims brought against motion pictures under every theory from Lanham Act violations to right of publicity claims. See, e.g., Hicks v. Casablanca Records, 464 F. Supp. 426 (S.D.N.Y. 1978) (granting motion to dismiss and denying preliminary injunction on claims against fictional film and book about Agatha Christie entitled "Agatha"); Leopold v. Levin, 45 Ill. 2d 434, 441-42 (1970) (affirming summary judgment dismissing plaintiff's privacy claim against motion picture and its advertising).

B.    The *Rogers* Test

The conflict between Lanham Act claims and the First Amendment protection for artistic expression was addressed in the seminal case of Rogers v. Grimaldi, 695 F. Supp. 112 (S.D.N.Y. 1988), aff'd, 875 F.2d 994 (2d Cir. 1989), which concerned director Federico Fellini's film *Ginger and Fred*. The film was not about the iconic American film stars Ginger Rogers and Fred Astaire, but about two fictional Italian cabaret performers who had earned their livings by

imitating Rogers and Astaire.  Id. at 996-97.  Rogers alleged that the use of her name in the

film's title violated the Lanham Act.  The Court noted:

> Many titles, however, include a well-known name without any overt indication of
> authorship or endorsement — for example, the hit song "Bette Davis Eyes," and
> the recent film "Come Back to the Five and Dime, Jimmy Dean, Jimmy Dean."
> To some people, these titles might implicitly suggest that the named celebrity had
> endorsed the work or had a role in producing it. Even if that suggestion is false,
> the title is artistically relevant to the work. In these circumstances, the slight risk
> that such use of a celebrity's name might implicitly suggest endorsement or
> sponsorship to some people is outweighed by the danger of restricting artistic
> expression, and the Lanham Act is not applicable. Cf. Estate of Hemingway v.
> Random House, Inc., 23 N.Y.2d 341, 350, 296 N.Y.S.2d 771, 780, 244 N.E.2d
> 250, 260 (1968) (holding that estate of Ernest Hemingway had no cause of action
> for "palming off" or "unfair competition" against author of biographical memoir
> entitled "Papa Hemingway.").
>
> Similarly, titles with at least minimal artistic relevance to the work may include
> explicit statements about the *content* of the work that are seriously misleading.
> For example, if the characters in the film in this case had published their memoirs
> under the title "The True Life Story of Ginger and Fred," and if the film-maker
> had then used that fictitious book title as the title of the film, the Lanham Act
> could be applicable to such an explicitly misleading description of content. But
> many titles with a celebrity's name make no explicit statement that the work is
> about that person in any direct sense; the relevance of the title may be oblique and
> may become clear only after viewing or reading the work.  As to such titles, the
> consumer interest in avoiding deception is too slight to warrant application of the
> Lanham Act.

Id. at 999-1000 (emphasis supplied).

The Second Circuit held that the First Amendment precludes Lanham Act claims

premised upon the title of an expressive work unless the title "has *no* artistic relevance to the

underlying work whatsoever, or, if it has some artistic relevance, unless [it] *explicitly* misleads as

to the source or the content of the work."  Id. at 999 (emphasis added).  Finding *Ginger and*

*Fred's* title artistically relevant to the film's fictional content and not explicitly misleading as to

its source, the Court affirmed the dismissal of Rogers's Lanham Act claim as a matter of law.  Id.

at 1000-1005.  The two-prong Rogers test – *i.e.,* (i) whether a work's title has some artistic

relevance to its content and (ii) whether it *explicitly* misleads – has been widely adopted and has

been extended to the use of both names and trademarks in the *content* of expressive works, as well as in their *titles*, leading to such claims regularly being dismissed as a matter of law.  See, e.g., Louis Vuitton Mallatier S.A. v. Warner Bros. Entm't Inc., 868 F. Supp. 2d 172, 177 n.9 (S.D.N.Y. 2012) ("Louis Vuitton") (use of trademark in content of film); Mattel, Inc. v. MCA Records, 296 F.3d 894, 902 (9th Cir. 2002) (use of trademark in title and content of song); ETW Corp. v. Jireh Publ'g, Inc., 332 F.3d 915, 928 (6th Cir. 2003) (use of name and trademark in marketing materials for prints of painting); Sugar Busters LLC v. Brennan, 177 F.3d 258, 269 n.7 (5th Cir. 1999) (use of trademark in book title).

### 1.    The Title "*Loisaidas*" Has Clear Artistic Relevance To The Film's Story

The Rogers court emphasized that the first element test reflects an "appropriately low threshold of minimal artistic relevance" in light of First Amendment considerations.  875 F.2d at 999.  See Louis Vuitton, 868 F. Supp. 2d at 178; E.S.S. Entm't 2000, Inc. v. Rock Star Videos, Inc., 547 F.3d 1095, 1100 (9th Cir. 2008) ("the level of relevance merely must be above zero" to "merit First Amendment protection") (internal citation and quotation marks omitted).

The title *Loisaidas* – for a motion picture that tells a story about the neighborhood that is officially recognized as "Loisaida" and its denizens – has more than merely "*some* artistic relevance" to the Film.  See, e.g., Valencia v. Universal City Studios LLC, No. 1:14-cv-00528-RWS, 2014 U.S. Dist. LEXIS 174644, at *21 (N.D. Ga. Dec. 18, 2014) (dismissing Lanham Act claims against film about hip hop dancer "Honey Rockwell," holding title *Honey* was artistically relevant to protagonist's first name).

In Roxbury Entm't v. Penthouse Media Group, Inc., 669 F. Supp. 2d 1170, 1173 (C.D. Cal. 2009), the plaintiff, who owned the trademark "Route 66," filed suit against the entities which had made a pornographic film with that same title.  The film's only relationship to the

"Route 66" interstate was that "[t]he 'story' unfolds at a roadside motel, to which the couple [who is 'on the run'] pulls up in a red convertible in the opening scene of the movie." Id. at 1173.  The court found that even this minimal connection satisfied the first Rogers prong and dismissed the claims as a matter of law.  Id. at 1176.  It follows a fortiori that in the present case, in which the Film's title utilizes the officially recognized and widely used term for the neighborhood and inhabitants of the Lower East Side for a  story that takes place there, the first prong of the test is met.

In Woodard v. Jackson, No. 1:03-cv-0844-DFH, 2004 U.S. Dist. LEXIS 6292, at *3 (S.D. Ind. Mar. 25, 2004), the plaintiffs, the "former members of a musical ensemble" known as "Ripples and Waves," asserted Lanham Act claims against Michael Jackson premised upon the title of his album "Ripples and Waves – An Introduction to Michael Jackson & the Jackson Five."  Finding the requisite degree of artistic relevance in the album's title, the court dismissed the claims on a 12(b)(6) motion.  Id. at *24-25.  For the same reasons, Plaintiff Medina's claim, in which he asserts that the name of his "musical ensemble" is wrongly used as the title of the Film, should be dismissed as a matter of law since "Loisaidas" is a far more widespread and independently meaningful term than "Ripples and Waves."

Finally, the court in Dillinger, LLC v. Electronic Arts, Inc., No. 1:09-cv-1236-JMS-DKL, 2011 U.S. Dist. LEXIS 64006 (S.D. Ind. June 16, 2011), found that the name "Dillinger" in reference to a Tommy Gun was artistically relevant to the defendants' The Godfather video game because "[t]he gentleman-bandit, commonly known for his public persona as a 'flashy gangster who dressed well, womanized, drove around in fast cars, and sprayed Tommy Guns,' has above-zero relevance to a game whose premise enables players to act like members of the mafia and spray Tommy Guns." Id. at *14, citing Roxbury, 669 F. Supp. at 1176 (emphasis supplied).  See

17

also <u>Brown v. Electronic Arts, Inc.</u>, No. 2:09-cv-01598-FMC-RZx, 2009 U.S. Dist. LEXIS

131387, at *12 (C.D. Cal. Sept. 23, 2009) (dismissing Lanham Act claims of former professional

football player Jim Brown against maker of football video game, holding that use "was not

completely irrelevant to the games' content").

      Here, it is beyond dispute that the Film's title, which is a commonly used term and is

used in the Film to refer to the Latino Lower East Side and its inhabitants,  has the requisite level

of artistic relevance to its content.

### 2.      <u>The Film's Title Is Not Explicitly Misleading</u>

      Like the "relevance" prong of the <u>Rogers</u> test, the "explicitly misleading" prong

preserves First Amendment protections except in extraordinary cases.  <u>See, e.g.</u>, <u>E.S.S. Entm't</u>

<u>2000</u>, 547 F.3d at 1099-1101.  Under this prong, a work's title is not "explicitly misleading"

absent some <u>affirmative claim</u> that the work originated with the plaintiff.  <u>See</u> <u>Dillinger</u>, 2011

U.S. Dist. LEXIS 64006, at *22-23 ("Plaintiff points to no explicit misrepresentation—that fact

alone is dispositive of this issue") (citing <u>Rogers</u>, 875 F.2d at 999 and <u>E.S.S. Entm't 2000</u>, 547

F.3d at 1100-1101) (emphasis added).  Medina does not allege that the Film makes any explicit

representation that it originates with or was endorsed by Medina.[21]  (Nor, of course, would it

make any sense to do so, given that the Film has no connection with Plaintiff's Bachata music.)[22]

<u>See e.g.</u>, <u>Mattel</u>, 296 F.3d at 902 ("The *only* indication that Mattel might be associated with the

song is the use of Barbie in the title; if this were enough to satisfy this prong of the *Rogers* test, it

---

[21] As with similar claims that have failed as a matter of law, the SAC offers only vague allegations of confusion, rather than any specific allegation that Defendants have made an explicitly misleading statement.  <u>See</u> <u>Louis Vuitton</u>, 868 F. Supp. 2d at 181.  For this reason alone, as in <u>Louis Vuitton</u>, Medina's allegations of confusion are not plausible and do not pass the requisite threshold.  <u>Id.</u> at 182.

[22] The <u>Woodard</u> court noted that it would be "absurd to suggest" that The Jackson Five and their record company would seek to gain some commercial advantage by confusing the public into believing that they might be buying sound recordings connected with plaintiffs' musical group.  2004 U.S. Dist. LEXIS 6292, at *30.  Similarly, here it would be "absurd to suggest" that Defendants would seek some commercial advantage by confusing the public into believing that the Film – which, as Plaintiff alleges, tells a story of a "violent, gangster-infused world [involving] drug dealing, mob wars, and murder" (SAC at ¶ 5) – is about or from Plaintiff's Bachata music duo.

would render *Rogers* a nullity"); <u>Valencia</u>, 2014 U.S. Dist. LEXIS 174644, at \*20-22; <u>Fortres</u>

<u>Grand Corp. v. Warner Bros. Entm't, Inc.</u>, 947 F. Supp. 2d 922, 932 (N.D. Ind. 2013), <u>aff'd</u>, 763

F.3d 696 (7th Cir. 2014) (citation omitted) (dismissing Lanham Act claim against film under

<u>Rogers</u>, noting "[t]he fact that it has to be explicitly misleading makes this a high bar," which

requires that "defendant's work must make some affirmative statement of the plaintiff's

sponsorship or endorsement, beyond the mere use of plaintiff's name or other characteristic");

<u>Roxbury Entm't</u>, 669 F. Supp. 2d at 1176 ("Mere use, without more, is insufficient to make the

use explicitly misleading") (citation omitted).

There is nothing in the Film's title from which one could <u>plausibly</u> draw the conclusion

that Defendants are "explicitly misleading" consumers about the Film's origin.  As in <u>Rogers</u>,

"[t]he title [of Defendants' film] contains no explicit indication that [Plaintiff] endorsed the

[Defendants'] film or had a role in producing it."  <u>Rogers</u>, 875 F.2d at 1001.  As the <u>Mattel</u> court

stated: "[c]onsumers expect a title to communicate a message about the book or movie, but they

do not expect it to identify the publisher or producer."  296 F.3d at 902 (emphasis added)

(citation omitted).  <u>See also</u> <u>In re Cooper</u>, 254 F.2d 611, 615-16 (C.C.P.A. 1958) (a "title…

identifies a specific literary work… and is not associated in the public mind with the …

manufacturer…") (internal quotation marks omitted).[23]

The source of the Film is regularly noted, in the opening credits and throughout, and it is

*prominently and repeatedly credited to "Damon Dash Studios*."  It is that prominent designation,

not "Loisaidas," which identifies the Film's origin.  <u>See, e.g.</u>, <u>Rin Tin Tin, Inc. v. First Look</u>

<u>Studios, Inc.</u>, 671 F. Supp. 2d 893, 901 (S.D. Tex. 2009) (dismissing Lanham Act claims against

---

[23] The court in <u>DeClemente v. Columbia Pictures Indus.</u>, 860 F. Supp. 30, 52 (E.D.N.Y. 1994), dismissed the plaintiff's Lanham Act claims alleging, *inter alia*, that the title of the film *The Karate Kid* infringed his rights under the Lanham Act.  The court gave some examples of the sort of title that might have been "explicitly misleading" under <u>Rogers</u> - "The Karate Kid, an authorized biography" or "Bill DeClemente: the Karate Kid."

film studios in part because "'Defendants' use of the term 'Rin Tin Tin' described the content of the film []. 'Rin Tin Tin' was not a source identifier anywhere on the DVD cover or within the film, itself. []In fact, the only listed source identifiers on the DVD cover, disc, and within the film, itself, were [defendant film studios]") (citation omitted); Cummings v. Soul Train Holdings LLC, 67 F. Supp. 3d 599, 606 (S.D.N.Y. 2014) (dismissing Lanham Act claim where defendants' "trademarks 'Soul Train' and 'Time Life' [were] prominently displayed on the DVD sets' packaging and contents.")

When measured against the "explicitly misleading" standard, it is not just *implausible*, but *inconceivable*, that the use of "Loisaidas" as the title of the Film – with the repeated use of "Damon Dash Studios Presents" (and the Handgun Logo on the Soundtrack) – could "dup[e] consumers into buying a product [i.e., the Film] they mistakenly believe is sponsored by the trademark owner [i.e., the Plaintiff and/or his Bachata musical duo]." E.S.S. Entm't 2000, 547 F.3d at 1100 (citation and quotation omitted).  See, e.g., Arrow Prods., Ltd. v. Weinstein Co., 44 F. Supp. 3d 359, 373 (S.D.N.Y. 2014) (dismissing Lanham Act claims based on use of plaintiff's registered mark "Lovelace" as title of film because plaintiff could not plausibly allege that consumers were likely to be confused into thinking that plaintiff was involved in production of defendants' film).

Thus, the Film's title is protected artistic expression, which the SAC does not allege is explicitly misleading.  See Stewart Surfboards, Inc. v. Disney Book Grp., LLC, No. 10-cv-2982 (GAF SSx), 2011 U.S. Dist. LEXIS 155444, at *25-28 (C.D. Cal. May 11, 2011) (plaintiff failed to allege that defendant's use of plaintiff's mark on book cover had explicitly misled and book itself refuted any such contention, so that plaintiff could not state a plausible claim).[24]

---

[24] Plaintiff's counsel argued at the pretrial conference that the Court must consider the Polaroid factors to assess likelihood of confusion (per Twin Peaks Prods., Inc. v. Publications Int'l Ltd., 996 F.2d 1366 [footnote continued]

## III.  THE FILM'S USE OF "LOISAIDAS" IS A NONACTIONABLE FAIR USE

The primary meaning of "Loisaida" and "Loisaidas" to refer to the neighborhood and its residents existed prior to and independent of Medina and the musical duo that performs under his alleged trademark.  It is this meaning of the term that the Film employs.

In light of this, Plaintiff's Lanham Act claims are precluded by the fair use exception to trademark infringement, as set forth in Section 33(b)(4) of the Lanham Act, 17 U.S.C. §1115(b)(4), because the Film uses "Loisaidas" in its primary and descriptive sense.  As the Supreme Court explained in KP Permanent Make-Up, Inc. v. Lasting Impression I, Inc., 543 U.S. 111, 122 (2004), the Lanham Act was not intended "to deprive commercial speakers of the ordinary utility of descriptive words."  The Court stated:

> Since the burden of proving likelihood of confusion rests with the plaintiff, and the fair use defendant has no free-standing need to show confusion unlikely, it follows … that some possibility of consumer confusion must be compatible with fair use, and so it is. The common law's tolerance of a certain degree of confusion on the part of consumers followed from the very fact that in cases like this one an originally descriptive term was selected to be used as a mark, not to mention the undesirability of allowing anyone to obtain a complete monopoly on use of a descriptive term simply by grabbing it first. The Lanham Act adopts a similar leniency, there being no indication that the statute was meant to deprive commercial speakers of the ordinary utility of descriptive words. "If any confusion results, that is a risk the plaintiff accepted when it decided to identify its product with a mark that uses a well known descriptive phrase." Cosmetically Sealed Industries, Inc. v. Chesebrough-Pond's USA Co., 125 F. 3d at 30.

(543 U.S. at 121-22; emphasis supplied; internal citations omitted.)

The court in Hensley Mfg. v. ProPride, Inc., 579 F.3d 603 (6th Cir. 2009), affirming dismissal of Lanham Act claims based on fair use, noted that the likelihood of confusion analysis

---

(2d Cir. 1993)). However, Plaintiff failed to note that the Second Circuit held in Twin Peaks that "the finding of likelihood of confusion must be *particularly compelling* to outweigh the First Amendment interest recognized in Rogers." Id. at 1379 (emphasis added).  See also Louis Vuitton Mallatier, 868 F. Supp. 2d at 181-82; Syler v. Woodruff, 610 F. Supp. 2d 256, 265 (S.D.N.Y. 2009); Lemme v. NBC, 472 F. Supp. 2d 433, 446 (E.D.N.Y. 2007). For the reasons set forth herein, Plaintiff has failed to plead a legally sufficient claim under even the everyday Iqbal standard.  Since he could not possibly offer plausible allegations meeting the heightened "particularly compelling" threshold, the SAC should be dismissed with prejudice.

"involves a preliminary question: whether the defendants 'are using the challenged mark in a way that identifies the source of their goods.' … <u>If they are not, then the mark is being used in a "'non-trademark' way" and trademark infringement laws, along with the eight-factor analysis, do not even apply</u>." <u>Id.</u> at 610 (emphasis supplied), quoting <u>Interactive Prods. Corp. v. A2Z Mobile Office Solutions, Inc.</u>, 326 F.3d 687, 694 (6th Cir. 2003) (internal citation omitted).[25]  Thus, the court held, even if the plaintiff could have shown likelihood of confusion, its trademark infringement claim would be barred:

> Under the fair use doctrine, "the holder of a trademark *cannot* prevent others from using the word that forms the trademark in its *primary* or *descriptive* sense." <u>Herman Miller, Inc. v. Palazzetti Imports and Exports, Inc.</u>, 270 F.3d 298, 319 (6th Cir. 2001).  Rather,
>
>> [t]he only right of exclusion that trademark law creates in a descriptive word is in the secondary, new, 'trademark' meaning of the word that plaintiff has created. <u>The original, descriptive primary meaning is always available for use by others to describe their goods, in the interest of free competition</u>.
>
> <u>Id.</u> (quoting J. Thomas McCarthy, <u>McCarthy on Trademarks & Unfair Competition</u> § 11:45 (4th ed.1996)); <u>see also</u> <u>Car-Freshner Corp. v. S.C. Johnson & Son, Inc</u>., 70 F.3d 267, 270 (2d Cir. 1995). ("[F]air use permits others to use a protected mark to describe aspects of their own goods, provided the use is in good faith and not as a mark."). The fair use defense contemplates and tolerates "some possibility of consumer confusion." <u>KP Permanent</u>, 543 U.S. at 121, 125 S.Ct. 542.

(<u>Id.</u> at 612; emphasis in original and added.)  The court affirmed the district court's dismissal based on the <u>Iqbal</u> standard.  <u>Id.</u> at 613.

Similarly, the court in <u>Naked Cowboy v. CBS</u>, 844 F. Supp. 2d 510 (S.D.N.Y. 2012), dismissed the plaintiff's trademark claim based on fair use.  The court held:

> Here, the challenged phrase "Naked Cowboy" is an example of non-trademark use. It is clear that <u>CBS used the phrase in an effort to describe the contents of the video clip, not as a mark to identify the source </u>of the video clips. See <u>Arnold v.</u>

---

[25] The court observed that the Second Circuit had applied essentially the same logic in a case involving personal names.  <u>See id.</u> at 610, referring to <u>Madrigal Audio Laboratories v. Cello, Ltd.</u>, 799 F.2d 814, 816 (2d Cir. 1986).

ABC, Inc., No. 06 Civ. 1747, 2007 U.S. Dist. LEXIS 5802, 2007 WL 210330, at *2-*3 (S.D.N.Y. Jan. 29, 2007). The fact that the Episode's source is CBS and not Plaintiff is clearly evidenced by the prominent display of the series' title and CBS's own recognizable "Eye" logo, as well as the short caption beneath the clip which references only named characters on the series. Cosmetically Sealed Indus., Inc. v. Chesebrough-Pond's USA Co., 125 F.3d 28, 30-31 (2d Cir. 1997); Arnold, 2007 U.S. Dist. LEXIS 5802, 2007 WL 210330, at * 3.

(Id. at 515-16; emphasis added.)

As in Naked Cowboy, in the present case the term "Loisaidas" is not used to identify the source of the Film, which is plainly stated to be from "Damon Dash Studios," but, as titles typically do, to convey something about the Film's content.  Plaintiff's Lanham Act claims should, therefore, similarly be dismissed.

## IV.   PLAINTIFF'S STATE LAW CLAIM FAILS AS A MATTER OF LAW

Medina's state law claim – which merely adds a litany of conclusory labels regarding New York common law to the same allegations offered in the Lanham Act claims – fails as a matter of law for the same reason that Medina's Lanham Act claims must fail.  It is well settled that state law trademark claims will fail where, as here, they are "based on the same permissible conduct as [a] Lanham Act claim."  Louis Vuitton, 868 F. Supp. 2d at 184; see also Charles Atlas, Ltd. v. DC Comics, Inc., 112 F. Supp. 2d 330, 341 (S.D.N.Y. 2000); cf. Louis Vuitton Malletier v. Dooney & Bourke, Inc., 561 F. Supp. 2d 368, 381 (S.D.N.Y. 2008) (noting that the elements of unfair competition "mirror" the Lanham Act, except that plaintiffs must additionally show bad faith on the state law claim); Tri-Star Pictures, Inc. v. Unger, 14 F. Supp. 2d 339, 363 (S.D.N.Y. 1998) (federal trademark claims and common law unfair competition claims "are almost indistinguishable.") (citations omitted); Yankee Publ'g Inc. v. News Am. Publ'g Inc., 809 F. Supp. 267, 282 (S.D.N.Y. 1992) ("[T]he same First Amendment considerations that limit a cause of action under the Lanham Act apply also to a cause of action under New York law.").  Thus,

because the allegations supporting Medina's state common law unfair competition claims are identical to the allegations supporting Medina's Lanham Act claims, those claims should be dismissed for the same reasons.

**V.      THE SAC SHOULD BE DISPOSED OF ON THIS MOTION**

Trademark claims are subject to dismissal as a matter of law where a defendant's First Amendment rights are implicated "because if a suit entails 'long and expensive litigation,' then the protective purpose of the First Amendment is thwarted even if the defendant ultimately prevails." Farah v. Esquire Magazine, 736 F.3d 528, 535 (D.C. Cir. 2013) (quoting Washington Post Co. v. Keogh, 365 F.2d 965, 968 (D.C. Cir. 1966)); Dombrowski v. Pfister, 380 U.S. 479, 487 (1965) ("[t]he chilling effect upon the exercise of First Amendment rights may derive from the fact of the prosecution [of a lawsuit], unaffected by the prospects of its success or failure."). See Stewart Surfboards, 2011 U.S. Dist. LEXIS 155444, at *25 (dismissing complaint with prejudice lest plaintiff be permitted to "chill artistically relevant expressive uses").

Notably, the court in Louis Vuitton rejected the plaintiff's argument that the Rogers test could not be assessed on a Rule 12 motion, holding that pre-discovery dismissal of trademark claims is appropriate "where simply looking at the work itself, and the context in which it appears, demonstrates how implausible it is that a viewer will be confused into believing that the plaintiff endorsed the defendant's work (and without relying on the likelihood of confusion factors to do so)." 868 F. Supp. 2d at 183.[26] See also Eastland Music Grp. LLC v. Lionsgate Entm't, Inc., 707 F.3d 869, 872 (7th Cir. 2013), cert. denied, 134 S. Ct. 204 (U.S. 2013) (12(b)(6) dismissal of trademark claim regarding film title because plaintiff "could not plausibly [ ] allege" consumer confusion).

---

[26] The Louis Vuitton court stated  "[i]n a case such as this one, no amount of discovery will tilt the scales in favor of the mark holder at the expense of the public's right to free expression."  868 F. Supp. 2d at 184.

It is respectfully submitted that Plaintiff's claims should be dismissed as barred by the First Amendment, the _Rogers_ doctrine and fair use.

## **CONCLUSION**

Plaintiff's overreaching claims – by which he seeks to monopolize a term that preceded Plaintiff's use _by decades_, and which is used in the Film, consistent with its primary and original meaning, to refer to a neighborhood and its denizens – should be dismissed.  Plaintiff's claims must fail not _only_ because the SAC fails to meet the Iqbal standards, or because Plaintiff's attempt to chill protected speech is repugnant to First Amendment principles, or even because the fair use doctrine precludes them.  Plaintiff's claims must also fail because they defy common sense.  Taken to their logical conclusion, Plaintiff's claims would mean that the musical groups "Chicago," "Boston," "Kansas" or "Alabama" would have the right to stop (and/or profit from) films using these geographical names,[27] even if the films had nothing to do with those bands. Merely stating such a proposition demonstrates why it must be rejected.

For all of the foregoing reasons, West respectfully requests that his Rule 12(b)(6) motion be granted in its entirety and the SAC be dismissed with prejudice.

Dated:  New York, New York
        October 2, 2015

---

[27] As Woody Allen's _Manhattan_ demonstrates, the notion of films with such titles requires little stretch of the imagination.  In fact, there was a 1988 feature film entitled _Kansas_, starring Matt Dillon and Andrew McCarthy (see http://www.imdb.com/title/tt0095428/?ref_=fn_al_tt_1), and a 2010 television movie entitled _Alabama_ (see http://www.imdb.com/title/tt1706627/?ref_=fn_al_tt_1).  There are both a musical group and a 2009 film called _America_.  (See http://www.venturahighway.com/index.php?module=pagemaster&PAGE_user_op=view_page&PAGE_id=9&MMN_position=49:49 and http://www.imdb.com/title/tt1347508/?ref_=fn_al_tt_2).  There is also a punk rock bank called "Defiance, Ohio" and a 2005 film entitled _The Prize Winner of Defiance, Ohio_ (see http://www.imdb.com/title/tt0406158/?ref_=fn_al_tt_1).

Respectfully submitted,

PRYOR CASHMAN LLP

Brad D. Rose
Tom J. Ferber
Dyan Finguerra-DuCharme
7 Times Square
New York, New York 10036
Telephone: (212) 421-4100
Fax: (212) 326-0806
brose@pryorcashman.com
dfinguerra-ducharme@pryorcashman.com
tferber@pryorcashman.com

*Attorneys for Defendant Kanye West*